**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 94-30504
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,


versus


ARTHUR S. HUEY, IV and
ANTONIO A. GARCIA

Defendants-Appellants.


_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

(February 16, 1996)



Before JOLLY, DUHÉ and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Defendants-Appellants Arthur S. Huey, IV and Antonio A. Garcia appeal their convictions on charges of conspiring to distribute marijuana, making threats or using violence in order to collect an extension of credit, and using a firearm in relation to a crime of violence. Concluding that the jury selection process in this case violated <u>Batson v. Kentucky</u>[1] and its progeny, we reverse and remand

_____

    [1]  476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986).

for a new trial.

## I

## FACTS AND PROCEEDINGS

The convictions underlying this appeal arise from the drug-related activities of Defendants-Appellants Arthur S. Huey, IV, a Caucasian, and Antonio A. Garcia, an Hispanic-American. Over a period of a year and one-half, Huey and Garcia sold marijuana to Marshall Howell. The instant case concerns Huey's and Garcia's last sale to Howell. On this particular occasion, Howell paid Huey two-thirds of the purchase price for the marijuana, but did not did not have the remaining funds due for the drugs. Howell became fed up with defendants' efforts to collect the balance due, so he anonymously contacted the Federal Bureau of Investigation (FBI) and offered information. Subsequently, he met with an FBI agent and explained the series of events. Howell agreed to cooperate with the FBI and was provided a tape recording device to record telephone conversations. Howell taped several telephone conversations in which Huey and Garcia made demands for the money owed them. These tapes were later used by the government as evidence against Huey and Garcia.

The Grand Jury for the Eastern District of Louisiana returned a three-count indictment against Huey and Garcia, to which both pleaded not guilty and went to trial.

At the close of the voir dire of the venire, counsel for Huey moved to exclude six potential jurors. As noted on the record by Huey's counsel, these six jurors constituted all of the African-

Americans and persons with Hispanic surnames in the jury pool. Huey's counsel explained that the government would be playing tapes and offering transcripts that contained harsh and offensive racial epithets. Accordingly, argued counsel for Huey, no minority juror would be able to make an unbiased decision regarding Huey's guilt or innocence after hearing these tapes.[2]

The district court refused the request to exclude the prospective jurors who were African-American or had Hispanic surnames, but did state that it would voir dire the individuals with respect to whether any of them would be influenced by the tapes' racial slurs. The district court then advised the prospective jurors that the tapes contained racial slurs of significant proportion involving African-Americans and Hispanic-Americans and inquired whether such language would affect their ability to hear the case in a fair and impartial manner. None of the prospective jurors responded that the content of these tapes would influence their decision-making process with respect to determining the defendants' guilt or innocence.

Following this voir dire by the district court, jury selection began. The defendants' ten peremptory challenges were allocated equally, five to Huey and five to Garcia. Counsel for Huey began the selection process by striking three African-Americans from the jury pool. Both the government and counsel for Garcia made Batson

---

[2] Prior to trial, Huey's counsel filed a Motion in Limine seeking to exclude these tape recordings from evidence because of, inter alia, the derogatory and offensive references to race, religion, ethnicity, and gender they contain. The district court ruled that the tapes would be played.

3

objections, asserting that these strikes were improperly made on the basis of race.[3]  The district court stated that Huey's counsel could respond to the objections if he wished, but that the court did not find it necessary for him to do so; and the record reflects no response from Huey's counsel.

The selection process continued, and the government and Garcia's counsel were given opportunities to exercise some of their peremptory challenges.  When it was Huey's turn again, counsel used his two remaining peremptory challenges to strike two more African-Americans.  Again, counsel for Garcia made a <u>Batson</u> objection. After noting this objection, the district court without further comment allowed Huey's five peremptory challengesSQall of which had been used to strike African-AmericansSQto stand, and the trial proceeded.

The following day, the jury returned with a verdict of guilty on all counts as to both Huey and Garcia.  Huey and Garcia now appeal, both arguing <u>inter</u> <u>alia</u> that the jury selection process violated <u>Batson v. Kentucky</u> and its progeny.

II

ANALYSIS

We review a trial court's decision on a <u>Batson</u> challenge under the clearly erroneous standard.[4]  Garcia insists that the district

_____

[3]  The government no longer challenges the peremptory strikes.

[4]  <u>United States v. Seals</u>, 987 F.2d 1102, 1108-09 (5th Cir.), <u>cert. denied</u>, __ U.S. __, 114 S. Ct. 155, 126 L.Ed.2d 116 (1993).

court committed reversible error by failing to protect the equal protection rights of the five African-American prospective jurors who were peremptorily challenged.  We agree.

In <u>Batson v. Kentucky</u>,[5] the Supreme Court held that equal protection principles prohibit a prospective juror from being peremptorily challenged on the basis of race.  The protection of <u>Batson</u> from the harms of racial discrimination in jury selection is not extended solely to individual defendants, but also to the excluded jurors.[6]  "An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race."[7]  Thus, discrimination in the form of excluding a prospective juror because of the juror's raceSQeven a race that is different from that of the defendantSQconstitutes a violation of the excluded juror's equal protection rights.[8]  Whether the discriminatory challenge is made by the prosecution or a defendant makes no difference.[9]

Under <u>Powers v. Ohio</u>, a defendant has standing to raise the prospective juror's claim of an equal protection violation by way

---

[5]  476 U.S. 79, 106 S. Ct. 1712, 90 L.E.2d 69 (1986).

[6]  <u>Batson v. Kentucky</u>, 476 U.S. 79, 87, 106 S. Ct. 1712, 1718, 90 L.E.2d 69 (1986).

[7]  <u>Powers v. Ohio</u>, 499 U.S. 400, 409, 111 S. Ct. 1364, 1370, 113 L.E.2d 1017 (1991).

[8]  <u>Id.</u>

[9]  <u>Georgia v. McCollom</u>, 505 U.S. 42, 49, 112 S. Ct. 2348, 2353, 120 L.E.2d 33 (1992).  A criminal defendant's exercise of peremptory challenges constitutes state action for purposes of the Equal Protection clause.  <u>Id.</u> 505 U.S. at 50-55, 112 S. Ct. at 2354-57.

5

of a <u>Batson</u> challenge.[10]  Although the instant case is atypical, in that one defendant is challenging the peremptory strikes of a co-defendant, the rationale articulated in <u>Powers</u> for holding that a defendant has standing to raise this claim on behalf of prospective jurors is equally cogent and applicable in this situation. Therefore, we conclude that Garcia has standing to challenge the juror selection process based on his co-defendant's improper racial use of peremptory challenges.

A three-step inquiry is made to determine whether a party has used peremptory challenges in a way that violates the Equal Protection clause.  First, the opponent of the strike must make a prima facie showing that the proponent of the strike exercised it on the basis of a juror's cognizable racial background.[11]  The burden then shifts to the proponent of the strike to articulate a race-neutral explanation for removing the juror in question.[12] Finally, the trial court must determine whether the opponent of the strike has proved purposeful discrimination.[13]

Huey's counsel used all five of his peremptory challenges to

---

[10]  <u>Powers</u>, 499 U.S. at 415, 111 S. Ct. at 1373.

[11]  <u>United States v. Seals</u>, 987 F.2d 1102, 1108 (5th Cir. 1993), <u>cert. denied</u>, __ U.S. __, 114 S. Ct. 155, 126 L.Ed.2d 116 (1993).

[12]  <u>Id.</u> at 1108-09.  The Supreme Court has recently refined this step by holding that this race-neutral explanation tendered by the proponent need not be persuasive, or even plausible. <u>Purkett v. Elem</u>, __ U.S. __, 115 S. Ct. 1769, 1771, 131 L.E.2d 834 (1995).  The persuasiveness of this explanation becomes relevant in the third step of the inquiry.  <u>Id.</u>

[13]  <u>Seals</u>, 987 F.2d at 1109.

6

strike African-Americans from the venire. These strikes followed on the heels of the court's rejection of Huey's counsel's request that all of the African-Americans and persons with Hispanic surnames be excluded for cause. This request was based not on any particular characteristics of the individual prospective jurors but on counsel's belief that all members of these groups were incapable of being impartial in the face of the racially offensive content of the tape recordings that the jury would hear. We have no doubt, nor does the government contest, that Garcia met his first-step burden of making a prima facie case that Huey's counsel exercised these challenges on the basis of race.

The burden then shifted to Huey's counsel to offer a race-neutral explanation for these strikes. Although the district court stated that it did not find it necessary for Huey's counsel to respond to the <u>Batson</u> objections, it did provide an opportunity for Huey's counsel to make such a response. Yet no explanationSQrace-neutral or otherwiseSQwas proffered in response to these objections.

The government argues that it may be that Huey's attorney simply did not believe the prospective jurors' responses to the court's voir dire and that this is a sufficient race-neutral explanation. The record, however, in no way supports this argument. The only reason articulated in the record for why these jurorsSQas a class and not individuallySQshould not serve is that they would be biased after hearing the derogatory language and racial slurs contained on the tapes. This reason was premised only

7

on the race of these jurors; no mention was ever made of any non-racial characteristic of any individual juror. Thus, the explanation in the record for these strikes is nothing more than an assumption of partiality based on race and a form of racial stereotyping, both of which have been repeatedly condemned by the courts.[14] The Supreme Court has firmly "rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror."[15] We do so again today.

As the district court failed to discharge its clear duty either to elicit a race-neutral explanation for the peremptory challenges or deny the use of those challenge, it committed reversible error in determining implicitly that the equal protection rights of these jurors had not been violated. Such error requires a new trial as to both Garcia and Huey.

We are not unaware that there is some irony in reversing Huey's conviction given that it was his counsel who made the discriminatory strikes. We are convinced, however, that this result is consistent with the teachings of Batson and its progeny. In addition to harming individual defendants and prospective jurors, racial discrimination in the selection of jurors impugns

---

[14] E.g., Georgia v. McCollom, 505 U.S. 42, 59, 112 S. Ct. 2348, 2359, 120 L.E.2d 33 (1992) ("the exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party."); Powers v. Ohio, 499 U.S. 400, 410, 111 S. Ct. 1364, 1370, 113 L.E.2d 1017 (1991) ("We may not except as a defense to racial discrimination the very stereotype the law condemns.").

[15] McCollom, 505 U.S. at 59, 112 S. Ct. at 2359.

8

the integrity of the judicial system and the community at large. "Be it at the hands of the State or the defense, if a court allows jurors to be excluded because of a group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justiceSQour citizens' confidence in it."[16]

The discriminatory jury selection process of this trial offends the Constitution and calls into question the integrity of our judicial system. We conclude that only by repudiating all results from such a trial can public confidence in the integrity of this system be preserved, even when it means reversing the conviction of the very defendant who exercised the discriminatory challenges. Although we recognize that some might fear that this resolution could become a source of mischief in the hands of some co-defendants, we believe that not only is this resolution mandated by Batson and its progeny, but that such mischief can be avoided with relative ease by the exercise of diligent oversight and sound judgment on the part of trial judges, and through their proper application of the well-known three-step inquiry for ensuring race-neutral use of peremptory challenges.

III

CONCLUSION

As the district court failed to ensure the Equal Protection rights of the prospective jurors in accordance with Batson and its

---

[16] Id. 505 U.S. at 49-50, 112 S. Ct. at 2354 (internal quotation marks and citation omitted).

progeny, we

REVERSE and REMAND for a new trial consistent with this opinion.

E. GRADY JOLLY, Circuit Judge, with whom DUHE', Circuit Judge, join in concurring specially:

I concur in the majority opinion and write briefly to express my concern over what appears to me to be an indisputable abuse of the Batson v. Kentucky[17] rule by the defendant, Arthur Huey. In the simplest of terms, Huey has gained an unwarranted advantage of the ruling as follows: 1) he uttered racial epithets in the course of committing a crime; 2) faced with mounting a defense before a jury of some individuals whose race he had insulted, he sought to preclude their service as jurors by requesting the court to remove all African Americans and all persons with Hispanic surnames; 3) when that request was denied, he used his peremptory strikes to preclude their service as jurors in violation of Batson; 4) although successfully purging the jury, he was nevertheless convicted; 5) he then appeals, complaining essentially of his own unconstitutional acts, and we now reverse his conviction and grant him a new trial on grounds that he created and benefitted from.

The majority correctly observes that under the Supreme Court

_____

[17]Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

10

rationale it is "[t]he discriminatory jury selection process of this trial" that offends the Constitution and demands reversal. The majority is also correct that such abuses in the future must be avoided by the diligence of trial judges. Nevertheless, "the integrity of the jury system," a principle underlying the <u>Batson</u> decision, is not well served by the result we reach today, because the public trust will be undermined when a convicted criminal can win a new trial based on his own abuse of the justice system.