IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LUIS G. CABRERA, JR., | § | |
| | § | No. 372, 2015 |
| Defendant Below, | § | |
| Appellant, | § | Superior Court—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 9904019326 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: June 7, 2017
Decided: July 31, 2017
Revised: August 1, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices; **Kerr**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Superior Court: **AFFIRMED**.

Thomas C. Grimm, Esquire, Rodger D. Smith II, Esquire (*Argued*), Stephen J. Kraftschik, Esquire, and Anthony D. Raucci, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware for Defendant Below, Appellant Luis G. Cabrera, Jr.

Elizabeth R. McFarlan, Esquire and Maria T. Knoll, Esquire (*Argued*), Department of Justice, Wilmington, Delaware for Plaintiff Below, Appellee State of Delaware.

**SEITZ**, Justice:

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

In 2001, a Superior Court jury convicted Luis Cabrera of two counts of First Degree Murder and other offenses for the execution-style killing of Vaughn Rowe and Brandon Sanders in Wilmington's Rockford Park. His co-defendant, Luis Reyes, was tried separately and also found guilty of First Degree Murder.[1] Both defendants were sentenced to death. After Cabrera's conviction and sentence were affirmed on direct appeal,[2] Cabrera filed a motion in November 2004 for postconviction relief claiming in part his trial counsel was ineffective in his defense. The motion took years to resolve due to events outside of counsel's and the Superior Court's control. The Superior Court in 2015 granted the motion in part, ruling that Cabrera's trial counsel was ineffective during the penalty phase of the trial, and vacated Cabrera's death sentence.[3] The Superior Court denied the remainder of Cabrera's postconviction claims. Cabrera appeals from the Superior Court's denial of his motion for postconviction relief. The State voluntarily dismissed its cross-appeal of the Superior Court's vacatur of Cabrera's death sentence in light of our decisions in *Rauf v. State*[4] and *Powell v. State*,[5] finding Delaware's death penalty statute unconstitutional and applying our ruling retroactively. We now affirm.[6]

---

[1] *Reyes v. State*, 819 A.2d 305, 318 (Del. 2003), *cert. denied*, 540 U.S. 862 (2003); *State v. Reyes*, 2016 WL 358613 (Del. Super. Jan. 27, 2016), *rev'd*, 155 A.3d 331 (Del. 2017).
[2] *Cabrera v. State* (*Cabrera Direct Appeal*), 840 A.2d 1256 (Del. 2004).
[3] *State v. Cabrera*, 2015 WL 3878287 (Del. Super. June 22, 2015).
[4] 145 A.3d 430 (Del. 2016).
[5] 153 A.3d 69 (Del. 2016).
[6] The Court expresses its appreciation to the law firm Morris, Nichols, Arsht & Tunnell LLP, and in particular attorneys Thomas C. Grimm, Rodger D. Smith II, Stephen J. Kraftschik, and Anthony

**I.**

In Cabrera's direct appeal we recounted the facts and procedural history underlying Cabrera's conviction.[7] Briefly stated, on January 21, 1996, a pedestrian discovered the bodies of Brandon Saunders and Vaughn Rowe in Rockford Park. The Wilmington Police determined that sometime during the night of January 20 or early hours of January 21, Rowe had been beaten, both victims were shot in the back of the head, dragged into the woods, and covered with a bed sheet.

The Wilmington Police Department appointed a detective as chief investigator. During the multi-year investigation, his investigative team uncovered compelling evidence that linked Cabrera and Reyes to the victims and the crime. In December 1999, Cabrera and Reyes were indicted and then tried separately for the Rockford Park murders. The State sought the death penalty for both men. Cabrera was already serving a life sentence for the murder of another individual, Fundador Otero.[8]

A Superior Court jury convicted Cabrera of two counts of First Degree Murder and other offenses. The jury recommended by a vote of 9-3 that Cabrera be sentenced to death. The trial court followed the jury's majority recommendation and

---

D. Raucci, for their extraordinary commitment of time and effort in pursuing postconviction relief on behalf of Mr. Cabrera.

[7] *Cabrera Direct Appeal*, 840 A.3d at 1260-62.

[8] *See Cabrera v. State*, 747 A.2d 543 (Del. 2000) (affirming Cabrera's conviction for murdering Fundador Otero).

imposed a death sentence. Cabrera appealed his conviction and sentence, and while the appeal was pending, filed a motion for a new trial claiming to have discovered new evidence calling into doubt his conviction. The trial court denied the motion. Our Court affirmed the convictions and sentence on direct appeal, including the trial court's denial of Cabrera's new trial motion.[9] Cabrera then filed a motion for postconviction relief under Superior Court Criminal Rule 61. In a lengthy opinion dated June 22, 2015, the Superior Court granted the motion in part by vacating Cabrera's death sentence.[10] The trial court ruled that Cabrera's trial counsel was ineffective during the penalty phase of the trial. The court denied the remainder of the motion. This appeal followed.

## II.

Cabrera raises ten arguments challenging the Superior Court's denial of his postconviction motion: (1) the Superior Court should have considered Cabrera's reverse *Batson* claim as a standalone claim, instead of limiting its assertion to an ineffective assistance of counsel claim; and even if Cabrera was limited to an ineffective assistance of counsel claim, prejudice did not have to be shown to demonstrate ineffective assistance of counsel; (2) trial counsel was ineffective for failing to move to suppress the gun taken from Cabrera's father's residence; (3) the

---

[9] *Cabrera Direct Appeal*, 840 A.2d at 1265-68.
[10] *Cabrera*, 2015 WL 3878287, at *14.

State's failure to disclose expert testimony until just before trial rendered the trial fundamentally unfair and violated due process; (4) the State's lead investigator improperly testified about a key piece of evidence rendering it inadmissible, and the State should have granted immunity to the witness who later sought to recant her allegedly perjured testimony; (5) the jury was improperly death qualified; (6) the *Allen* charge to the jury was unduly coercive and failed to include transitional language; (7) the State's alleged *Brady* violations affected the fairness of the trial; (8) the jury included members who were not properly qualified, and counsel was ineffective for failing to strike those jurors or move for a mistrial; (9) Cabrera's counsel should have been able to contact the jurors to investigate their bias or competence; and (10) the Superior Court improperly denied Cabrera's request to take discovery on a number of issues raised in the postconviction proceedings.

We review the Superior Court's denial of postconviction relief for abuse of discretion.[11] Legal and constitutional questions are reviewed *de novo*.[12] For each of Cabrera's postconviction claims, we will first review the Superior Court's application of the procedural bars of Superior Court Criminal Rule 61.[13] If Cabrera has overcome those procedural hurdles, we will then review the Superior Court's resolution of his claims.

---

[11] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).
[12] *Swan v. State*, 28 A.3d 362, 382 (Del. 2011).
[13] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990) (citing *Harris v. Reed*, 489 U.S. 255 (1989)).

During jury selection Cabrera's counsel, with Cabrera's close involvement,[14] exercised three peremptory challenges against members of the venire who were black. After Cabrera and his counsel struck the third black juror, the trial judge raised a concern about the strikes. Neither the State nor Cabrera, however, wanted the trial judge to inquire further into the strikes:

| | |
|---|---|
| TRIAL COURT: | Before the next juror, please, I don't mean to pull the pin out of the hand grenade, but that's at least the third African-American the defense has stricken. Two others were females, as I recall, and one of them was a male too. |
| THE STATE: | Your Honor has correctly recounted the record pertaining to the defense use of strikes. We have no application at this time, however. |
| DEFENSE COUNSEL: | Does the Court wish for me to make a record? |
| TRIAL COURT: | You might want to protect yourself, sure. |
| DEFENSE COUNSEL: | Well, I don't - - |
| THE STATE: | We have no application at this time and, in particular, we are not alleging, nor do we ask the Court to find that a prima facie case of racial animus in the exercise of peremptory challenges has been shown by this record. |

---

[14] Cabrera testified during the allocution phase of the trial that he "had a major role in selecting each and every one of you," referring to the jurors. App. to Answering Br. at 54 (Trans. of Penalty Phase, Feb. 15, 2001).

TRIAL COURT:     Okay. I make no such finding anyway. I'm not making a finding. I'm merely making an observation.[15]

Cabrera did not attack his peremptory challenges at trial or during his direct appeal. But, Cabrera changed course in his motion for postconviction relief. Even though he played a major role in the strikes, and trial counsel appeared ready at the time to defend the strikes at trial, Cabrera now claims his peremptory challenges violated his constitutional right to a fair trial because they were used to discriminate against jurors based on race—a so-called *Batson* claim.[16]

Alternatively, Cabrera reframes the argument as one for ineffective assistance of counsel. According to Cabrera, his counsel was ineffective in his defense because striking the three black jurors from the jury venire violated *Batson*, thereby creating a structural error in the trial requiring automatic reversal. In support of the claim, his trial counsel testified in a postconviction hearing that race was a factor in exercising Cabrera's peremptory strikes.[17]

The Superior Court dismissed Cabrera's standalone *Batson* claim because he failed to demonstrate a miscarriage of justice sufficient to overcome Rule 61's procedural bars.[18] The Superior Court did, however, find Cabrera's counsel

---

[15] App. to Opening Br. at 70-71.
[16] *Batson v. Kentucky*, 476 U.S. 79 (1986).
[17] App. to Opening Br. at 270 (Trans. of Postconviction Relief Evidentiary Hearing, Oct. 23, 2012).
[18] *Cabrera*, 2015 WL 3878287, at *17.

6

ineffective for violating *Batson* by striking three black jurors from the venire. But, without a showing that he suffered prejudice from his strikes, the court dismissed Cabrera's ineffective assistance of counsel claim.

As discussed below, we agree with the Superior Court that Cabrera's standalone *Batson* claim should be dismissed. We also affirm the Superior Court's dismissal of Cabrera's ineffective assistance of counsel claim.

i.

In *Batson v. Kentucky*, the United States Supreme Court held that discrimination based on race is prohibited in the State's selection of jurors.[19] In *Georgia v. McCollum*, the Supreme Court extended *Batson* to the defense, ruling that criminal defendants, like prosecutors, were prohibited from engaging in purposeful discrimination on account of race in selecting jurors.[20] Although the parties and the Superior Court have sometimes referred to Cabrera's claim as a reverse *Batson* violation, that description is inaccurate. A reverse *Batson* objection is lodged by the *State* to challenge the *defense's* improper peremptory strikes.[21] Here, there is no "reverse" in reverse *Batson* parlance. Cabrera has challenged his

---

[19] 476 U.S. 79 (1986).

[20] 505 U.S. 42 (1992).

[21] *McCoy v. State*, 112 A.3d 239, 249 (Del. 2015) ("A State's *Batson* objection to the defendant's exercise of a peremptory challenge is known as a reverse *Batson* claim."). A *Batson* objection can also be raised by one co-defendant against another, a circumstance not presented here. *See United States v. Thompson*, 528 F.3d 110 (2d Cir. 2008).

own strikes. Thus, the claim is best characterized as an alleged *Batson* violation by the defense, as recognized in *McCollum*.

As unlikely as it might have been, given that Cabrera was involved in exercising the strikes, Cabrera conceivably could have raised the *Batson* issue at trial or on direct appeal. Because he did not, his claim is procedurally defaulted under Rule 61(i)(3)[22] unless he can meet the fundamental fairness exception in Rule 61(i)(5). To do so, he must state "a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."[23] The circumstances of this case demonstrate otherwise.

Cabrera exercised his peremptory strikes in what he and his counsel perceived to be in Cabrera's best interest. After the State declined to object, the trial court allowed Cabrera to exercise his peremptory strikes as he saw fit. In this situation,

---

[22] We apply the version of Rule 61 in effect at the time Cabrera filed his motion for postconviction relief. *Bradley v. State*, 135 A.3d 748, 757 n.4 (Del. 2016). The then-applicable Superior Court Criminal Rule 61(i)(3) states:

> Procedural Default. Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this Court, is thereafter barred, unless the movant shows
> (A) cause for relief from the procedural default and
> (B) prejudice from violation of the movant's rights.

For his standalone claims, Cabrera has not attempted to show cause for relief from the procedural default. Thus, Cabrera must look to Rule 61(i)(5) to overcome Rule 61(i)(3)'s procedural bar.

[23] Super Ct. Crim. R. 61(i)(5) (2013).

the "steps the court takes at the defendant's behest are not reversible, because they are not error . . . ."[24]  He has waived the right to challenge his own strikes.[25]

Admittedly, the trial judge did express some discomfort with the strikes.  That discomfort, however, was an invitation to the State to object if it felt an objection was warranted.  The State's objection might have triggered a process for the defense to develop a record of non-discriminatory reasons for the strikes—something Cabrera appeared ready to do at the time.[26]  But, once the State decided not to object to the strikes, the trial judge wisely dropped the issue.  If the trial court had intervened, Cabrera could have objected on constitutional grounds to the trial court's interference with his right to freely exercise his preemptory challenges, risking a fundamental error early in the trial proceedings that could later upend the trial.[27]

---

[24] *United States v. Boyd*, 86 F.3d 719, 722 (7th Cir. 1996).

[25] *See id*. (The defendant "had a right to the verdict of a jury chosen without regard to race, but his lawyer waived that right on his behalf.").  We recognize that contrary authority exists addressing the remedy for defense counsel's *Batson* violation.  *See United States v. Huey*, 76 F.3d 638 (5th Cir. 1996).  *Huey* involved a unique circumstance where a defendant objected to a co-defendant's peremptory strikes on *Batson* grounds.  The *Huey* court granted a new trial to *both* defendants based on counsel's *Batson* error to protect the interests of jurors and the system of justice.  *Huey* is distinguishable in that the defendant raised the *Batson* issue on direct appeal and also did not appear to be involved in the improper strikes by his counsel.  In any event, we find the Seventh Circuit's analysis in *Boyd* persuasive.  As stated in *Boyd*, "no one is entitled to profit from his own wrong governs the conduct of trial as well as the imposition of criminal sanctions."  *Boyd*, 86 F.3d at 725.

[26] *See McCoy*, 112 A.3d at 251 (describing three step inquiry when trial court addresses a reverse *Batson* challenge).

[27] *See id*. at 257 ("[A] new trial is required when a juror is erroneously allowed to remain on the jury despite the defendant's valid peremptory challenge to that juror's presence."); *Sells v. State*, 109 A.3d 568, 582 (Del. 2015) ("[T]rial courts should be cautious about inhibiting the use of peremptory strikes by a defendant except after careful application of *Batson*.").  For this reason, the prosecution's reticence to make a reverse *Batson* challenge that might inhibit the defense's

Thus, under the circumstances of this case, Cabrera has not demonstrated a miscarriage of justice. His standalone *Batson* claim is barred by Rule 61(i)(3).

ii.

Turning to Cabrera's ineffective assistance of counsel claim, under *Strickland v. Washington*,[28] counsel is ineffective when (1) trial counsel's representation "fell below an objective standard of reasonableness;" and (2) "there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different."[29] Based on trial counsel's testimony during postconviction relief proceedings, the Superior Court decided that trial counsel committed a *Batson* violation, but ultimately dismissed the claim because Cabrera could not show he suffered any prejudice from the violation.

As we have held, Cabrera cannot shift responsibility to his trial counsel for decisions in which he played a major role.[30] And, even if we assume a *Batson*

---

approach to jury selection and give rise to a claim might also be viewed as prudent, which reinforces the wisdom of the trial judge not pressing an issue that the prosecution likely made a thoughtful decision not to pursue.

[28] 466 U.S. 668 (1984).

[29] *Id*. at 688, 694.

[30] *Id*. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1240 (11th Cir. 2010) ("A mentally competent defendant's instruction not to investigate or not to present mitigation evidence may make counsel's decision not to investigate or present mitigation evidence reasonable."); *In re Pers. Restraint of Benn*, 952 P.2d 116, 130 (Wash. 1998) (defendant cannot base an ineffective assistance claim on counsel's accession to his client's wishes regarding the presentation of certain testimony and the cross-examination of a witness).

violation, the Superior Court correctly held that Cabrera was not relieved of showing prejudice under *Strickland*.

In *Weaver v. Massachusetts*,[31] the United States Supreme Court recently addressed the issue presented here—whether a structural error in the trial[32] caused by constitutionally ineffective representation by defense counsel relieved the defendant from showing prejudice under *Strickland*. In *Weaver*, trial counsel failed to object to closing of the courtroom during jury selection—a public trial right violation that on direct appeal would ordinarily result in automatic reversal.[33]

The Supreme Court first contrasted structural claims raised on direct review with those raised much later in postconviction proceedings. On direct review, when an objection has been made in the trial court, and a structural violation occurred, fundamental fairness usually requires automatic reversal after appeal.[34] But, the same structural error raised in postconviction relief proceedings require a weighing of competing interests. According to the Court, when a structural error is raised in

---

[31] 137 S. Ct. 1899 (2017).

[32] Structural errors affect "'the framework within which the trial proceeds,'" as opposed to "being 'simply an error in the trial process itself.'" *Id.* at 1908 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)); *see also Drummond v. State*, 51 A.3d 436, 440 (Del. 2012) (distinguishing "trial errors" from "structural defects"). A *Batson* error is typically a structural error requiring automatic reversal if a violation is found. *Batson*, 476 U.S. at 86-88 (excluding jurors based on race "violates a defendant's right to equal protection," "unconstitutionally discriminate[s] against the excluded juror," and "undermine[s] public confidence in the fairness of our system of justice"). *See also Rivera v. Illinois*, 556 U.S. 148, 161 (2009) (stating that *Batson* is one of the Supreme Court's "automatic reversal precedents").

[33] *Weaver*, 137 S. Ct. at 1908-10.

[34] *Id.* at 1911 (citing *Batson*, 476 U.S. at 100).

11

postconviction relief proceedings, the trial judge has been deprived of the chance to cure the violation.[35] Costs and uncertainties are also greater because of the lapse of time.[36] And the strong interest in the finality of criminal convictions is also at risk.[37] After weighing the competing interests, the Court struck the balance in favor of requiring prejudice to be shown for ineffective assistance of counsel claims for certain structural errors raised for the first time in postconviction proceedings.

The same factors at play in *Weaver* are present here. Neither party raised an objection, which would have allowed the trial judge to rule on a *Batson* violation at trial. The lapse of time before raising the claim—over a decade—has resulted in added costs and uncertainties between what occurred at trial and after-the-fact testimony over a decade later in postconviction proceedings. Perhaps most important, relieving Cabrera of the prejudice requirement would lead to opportunistic behavior by the defense. Like Cabrera did here, defendants could hedge their bets. During jury selection, if the State did not object, peremptory strikes could be exercised for improper purposes to get the jury venire the defense wanted in the hope of an acquittal. If things did not work out at trial, the defendant could, assisted by the testimony of his trial counsel, challenge his strikes in postconviction proceedings as unconstitutional because they were race-based. A new trial would

---

[35] *Id.* at 1912.
[36] *Id.*
[37] *Id.*

automatically follow. To allow this in light of the benefit Cabrera believed he received by striking the three jurors "would make a laughingstock of the judicial process."[38]

Cabrera admitted he could not prove prejudice from his strikes.[39] His ineffective assistance of counsel claim based on a *Batson* error was properly dismissed for failure to show prejudice from his own decisions.

### B.

In March 1997, Wilmington Police went to Cabrera's father's residence, where Cabrera lived at the time, to search for evidence related to the Otero murder. Cabrera's father signed a "Consent to Search Form," told the police his (Cabrera's father's) gun was in the house, and then led the police to the gun. Cabrera's father also told the police that Cabrera knew where he kept the gun and that Cabrera had access to it. The police seized the gun. A firearms and ballistics analyst testified during Cabrera's trial that the bullets found in the bodies of Saunders and Rowe were fired from the gun taken from Cabrera's father's residence.

Cabrera argues that his trial counsel was ineffective for failing to move to suppress his father's gun. According to Cabrera, although Cabrera's father consented to search the house, the police lacked separate probable cause to believe

---

[38] *Boyd*, 86 F.3d at 725.
[39] Oral Arg. at 7:01-9:14.

the seized gun was evidence of a crime. Further, trial counsel's reason for not moving to suppress the gun—it would be inconsistent with strategy at trial to deny that Cabrera had access to the gun—was objectively unreasonable because Cabrera could have claimed with impunity at the suppression hearing that the gun was in fact under his control.[40] The Superior Court disagreed and dismissed the claim.

Warrantless searches conducted with valid consent are a recognized exception to the warrant requirement.[41] Consent is valid if it is given voluntarily and if the person giving consent has the authority to do so.[42] Cabrera does not challenge the voluntariness of his father's consent. In light of Cabrera's father's consent to search the house and take the gun, trial counsel was not ineffective for failing to move to suppress the gun.

It is accurate that law enforcement generally must have probable cause before searching an area, and then probable cause to seize evidence uncovered during a search.[43] The cases relied on by Cabrera, however, involved warrantless searches

---

[40] *See Simmons v. United States*, 390 U.S. 377, 394 (1968) (evidence supporting a motion to suppress cannot be used against a defendant at trial); *Watts v. State*, 574 A.2d 264, 1990 WL 38279, at *3 (Del. Feb. 27, 1990) (TABLE) ("*Simmons* prohibits a defendant's testimony at a pretrial suppression hearing from being used against him at trial, on the issue of guilt.").
[41] *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).
[42] *Id.*
[43] *See Arizona v. Hicks*, 480 U.S. 321 (1987) (a police officer must have probable cause to believe items seized during a warrantless search are evidence of a crime); *Young v. State*, 339 A.2d 723, 724 (Del. 1975) ("'A search can be legal, yet the resultant seizure of property or papers discovered in the course thereof may be illegal.'") (quoting *United States v. Thomas*, 36 C.M.R. 462, 464 (C.M.A. Aug. 12, 1966)).

and seizures.[44]  Here, Cabrera's father voluntarily consented to the search of his residence for evidence pertinent to the Otero murder.  Cabrera's father also consented to removal of the gun from his house.  Given these facts, we fail to see how Cabrera could have succeeded on a motion to suppress a gun voluntarily turned over by its owner.  The Superior Court correctly dismissed this claim.

C.

In a search of Cabrera's father's residence, the investigating detective also took several belts.  On January 9, 2001, the first day of jury selection, Dr. Richard Callery, the Medical Examiner for the State of Delaware, compared the belts to photographs of Rowe's injuries.  Dr. Callery was prepared to testify that the distinct pattern on the buckle of one of the belts could have caused the injuries on Rowe's upper torso.  That same day, the State informed Cabrera's trial counsel that it intended to offer Dr. Callery's testimony at trial.

Cabrera's trial counsel moved to exclude the comparison, claiming the late disclosure of the belt evidence violated the State's discovery obligations.  He also

---

[44] In *Hicks*, the United States Supreme Court determined that, although police officers were lawfully present in an apartment to investigate a shooting and noticed what they thought might be stolen stereo equipment, the warrantless seizure of that equipment had to be supported by independent probable cause.  *Hicks*, 480 U.S. at 328.  In *Young*, independent probable cause did not exist to seize a television set from the back seat of a car after the occupants had been lawfully detained but later released after questioning.  We held that in a warrantless search, law enforcement must have probable cause to believe the items seized are evidence of a crime. 339 A.2d at 725.  Neither of these cases involved voluntary consent to search a person's house and seize his gun.

15

argued that there was no evidence to connect the belt buckle with Cabrera. The court agreed, ruling that Dr. Callery's comparison was inadmissible.[45]

One week later the State called Mileka Mathis to testify that Cabrera owned the belt with the particular buckle at the time of the Rockford Park murders. Mathis testified that she and Cabrera had a sporadic sexual relationship and that she was familiar with the clothing Cabrera wore. When Mathis was shown the belt buckle, she testified that she had seen that type of buckle before and that Cabrera had worn it. On cross-examination, Mathis testified that the investigating detective had contacted her by phone over the previous three to four weeks. According to Mathis, the investigating detective also showed her a "lineup" of the belts seized from Cabrera's father's residence.

The trial court then reconsidered its prior ruling and allowed Dr. Callery to express his opinion about the belt buckle wounds. The trial judge recessed trial for a week to allow the defense time to address Dr. Callery's testimony. Cabrera's trial counsel reasserted his objection but eventually countered Callery's testimony with another expert, Dr. Ali Hameli.

Cabrera argues on appeal that the State violated his constitutional rights by the late disclosure of the belt evidence, which, according to Cabrera, rendered his

---

[45] App. to Opening Br. at 92 (Trial Trans., Jan. 17, 2001).

trial fundamentally unfair.[46]   We agree with the Superior Court, however, that Cabrera previously raised the same or substantially similar arguments in his direct appeal, which our Court rejected.[47]   This claim is therefore barred under Rule 61(i)(4) which precludes relitigation of issues already considered in earlier proceedings.  We also agree with the Superior Court that reconsideration of the same claims is not warranted in the interests of justice.  Rule 61(i)(4)'s bar on litigating previously considered claims "is based on 'law of the case' doctrine."[48]   When applying the interests of justice exception, our Court has recognized two exceptions to law of the case—"when the previous ruling was clearly in error or there has been an important change in circumstances, in particular, the factual basis for issues previously posed . . . [and] [s]econd, the equitable concern of preventing injustice."[49]  Neither is present here.  Cabrera has merely repackaged as discovery violations the arguments about the belt buckle evidence he made during trial and on direct appeal.

---

[46] *See* Opening Br. at 14 (quoting *Lindsey v. Smith*, 820 F.2d 1137, 1151 (11th Cir. 1987)).
[47] *Cabrera Direct Appeal*, 840 A.2d at 1263-64:

> Cabrera did not suffer significant prejudice from the State's discovery violation. Although the State announced only a short time before trial its intention to present the evidence, Cabrera had known for several years that the State possessed the belt. In addition, despite the State's late proffer of the evidence, Cabrera had sufficient time to secure an expert witness to rebut the State's expert witness.  The court granted a recess to allow Cabrera's counsel time to locate and prepare a rebuttal expert.  The Superior Court did not abuse its discretion by allowing the State to introduce the belt and patterned injury evidence despite the State's discovery violation.

[48] *Weedon v. State*, 750 A2d 521, 527 (Del. 2000).
[49] *Id*. at 527-28.

17

The trial court and this Court on direct appeal thoroughly dealt with Cabrera's arguments about the belt buckle evidence and found them without merit.[50] We will not review them a second time.

Cabrera also raises four ineffective assistance of counsel claims relating to the belt evidence. First, Cabrera argues that his trial counsel failed to prepare for the State's use of the belt evidence and failed to maintain an objection to the discovery violation. We agree with the Superior Court that this argument has no support in the record. After the trial court ruled that Dr. Callery's comparison of the belt buckle to Rowe's injuries was admissible, the court recessed for one week to allow Cabrera's trial counsel to find an expert witness to rebut the comparison. Cabrera's trial counsel raised concerns that the comparison would be misleading and would leave room for inappropriate speculation. And trial counsel repeated a "continuing objection to the admissibility of [the comparison]."[51] Counsel had sufficient time to call Dr. Hameli as an expert witness for Cabrera, whose testimony contradicted Dr. Callery's comparison. The Superior Court correctly held that Cabrera failed to show that his trial counsel's actions fell below an objective standard of reasonableness in addressing the belt evidence.

---

[50] *Cabrera Direct Appeal*, 840 A.2d at 1263-64.
[51] App. to Answering Br. at 18 (Letter from Trial Counsel, Jan. 30, 2001).

18

Second, Cabrera argues that his trial counsel failed to object to Mathis' identification of the belt in the belt "lineup" even though the lineup was "illegally suggestive."[52] The Superior Court properly dismissed this claim. Cabrera points to no case law his counsel could have cited applying the safeguards regulating human being lineups to inanimate objects. Further, Cabrera cannot demonstrate actual prejudice. As this Court concluded when addressing this issue on direct appeal, even without Mathis' identification, the "circumstantial evidence, in addition to the medical examiner's testimony, demonstrated a nexus between the belt and the crime sufficient to authenticate the evidence and permit its introduction at trial."[53] Counsel could not have been ineffective for raising an argument that in the end would not have affected the admissibility of the belt buckle evidence.

Third, Cabrera argues that trial counsel was ineffective for failing to maintain the objection to the State's alleged discovery violation. We agree with the Superior Court that the record demonstrates otherwise. Cabrera's counsel made specific objections, continuing through the direct appeal, to the belt buckle evidence, which included its late disclosure.[54] The trial court also granted Cabrera a one-week recess

---

[52] Opening Br. at 16 (quoting *People v. Nation*, 604 P.2d 1051, 1058 (Cal. 1980)).

[53] *Cabrera Direct Appeal*, 840 A.2d at 1264.

[54] App. to Opening Br. at 83 (Defense Motion in Limine, Jan. 17, 2001); App. to Answering Br. at 17-18 (Letter from Trial Counsel, Jan. 30, 2001); *Cabrera Direct Appeal*, 840 A.2d at 1263 (discovery violation argument on appeal).

to locate an expert, whose testimony directly rebutted Dr. Callery's opinion. Thus, Cabrera suffered no prejudice.

Finally, Cabrera argues that his trial counsel was ineffective for failing to file a motion challenging Dr. Callery's expert testimony, despite initially indicating that they planned to file a *Daubert* motion to preclude his testimony. The Superior Court correctly concluded, however, that the decision to forego a *Daubert* motion does not fall below an objective standard of reasonableness. Cabrera's counsel assessed the State's evidence and determined, after speaking with his own expert, that the motion was unlikely to succeed.[55] Instead of challenging the testimony by motion, Cabrera's trial counsel shifted focus to the inconsistencies behind the methodology of Dr. Callery's comparison. This strategy also included offering Dr. Hameli to rebut the comparison. Accordingly, counsel's strategy with respect to the belt buckle evidence was not constitutionally ineffective.

## D.

After Cabrera's conviction, he and Mathis began writing letters to each other. Mathis also contacted Cabrera's trial counsel. Over the course of two interviews

---

[55] App. to Answering Br. at 17-18:

> After having reviewed the proffered evidence with Dr. Hameli, we feel duty bound to advise the Court that the methodology employed by the Medical Examiner's Office is, in fact, a readily accepted practice in the field of forensic pathology. Therefore, we believe that if Dr. Callery were to testify at the *Daubert* Hearing, the Court would find that the State had met its initial burden.

with Cabrera's trial counsel, Mathis recanted her trial testimony. She also claimed that she had a periodic sexual relationship with the investigating detective and that he had forced her to testify falsely.

Following the two interviews, in July 2002, Cabrera's trial counsel filed a motion for a new trial. The Superior Court held a hearing on the motion, at which the investigating detective denied encouraging Mathis to testify falsely and denied a sexual relationship with Mathis. After the State declined to grant Mathis' request for immunity, Mathis refused to testify at the hearing. Cabrera's counsel then argued for the admission of Mathis' statements from the two interviews under an exception to the hearsay rule. On April 3, 2003, the Superior Court denied the motion for a new trial and refused to consider Mathis' interview statements.[56] We affirmed the Superior Court's ruling on direct appeal.[57]

Much later on, in a 2012 affidavit, Mathis resurrected her false testimony claim. According to Mathis, had she been granted immunity, she would have recanted her previous trial testimony regarding her relationship with Cabrera and her knowledge of the belts.[58] She once again claimed that her earlier testimony about the belts had been coerced and was false. In his postconviction relief motion, Cabrera used Mathis' 2012 affidavit to attempt to raise standalone constitutional

---

[56] *State v. Cabrera*, 2003 WL 25763727, at *30 (Del. Super. Apr. 3, 2003).
[57] *Cabrera Direct Appeal*, 840 A.3d at 1268.
[58] App. to Opening Br. at 728-34.

violations and accompanying ineffective assistance of counsel claims. We agree with the Superior Court, however, that the claims were barred by Rule 61 or are meritless.

Turning first to the immunity issue, Cabrera faults the State for refusing to grant Mathis immunity to testify in postconviction proceedings. According to Cabrera, if Mathis had been granted immunity, she would not have invoked her Fifth Amendment privilege, and would have recanted her trial testimony. By withholding immunity, Cabrera contends, the State threatened or intimidated Mathis from testifying favorably to the defense at trial.

We are satisfied, as was the Superior Court, that the trial court sufficiently explored the circumstances of Mathis' testimony as part of the trial proceedings. Having litigated the issue once through direct appeal, Rule 61(i)(4) bars relitigation of the same issue unless it is in the interests of justice to do so. Here, we discern no interest of justice favoring reopening a decided issue. The trial court determined that Mathis' testimony at trial was credible, and her later change of heart was not. We affirmed this finding on direct appeal. Given Mathis' credibility problems, the Superior Court acted within its discretion to find that the interests of justice were not served by relitigating the same issue.[59]

---

[59] *See Saunders v. State*, 655 A.2d 308, 1995 WL 24888 (Del. 1995) (TABLE) (interest of justice not satisfied when the person recanting had existing credibility problems, the defendant offered no

Cabrera also asserts accompanying claims of ineffective assistance of counsel relating to Mathis' testimony. Cabrera argues that, at trial, his trial counsel failed to investigate Mathis before she testified and failed to object to her trial testimony. Cabrera also argues that, at the postconviction hearing, his trial counsel failed to corroborate her recantation statements and failed to admit these out-of-court statements under 11 *Del. C.* § 3507. We agree with the Superior Court that each of these claims is without merit.

First, Cabrera's trial counsel did investigate Mathis, and an investigator interviewed her on January 23, 2001.[60] Second, Cabrera cannot demonstrate that he was actually prejudiced by his trial counsel's failure to object to Mathis' testimony. As we explained on direct appeal, "Mathis' trial testimony was weak and related to only one small link among several implicating Cabrera in the crime . . . ."[61] Indeed, the "[s]eizure of the belt from among Cabrera's personal effects sufficiently demonstrated a connection between Cabrera and the belt."[62] Cabrera cannot demonstrate that the result of his trial would have been different if she had not

---

reasonable explanation for the sudden recantation, and other substantial evidence existed such that the jury probably would have reached the same verdict).

[60] *See* App. to Answering Br. at 9-10 (Investigator's Fax to Defense Counsel, Jan. 23, 2001).
[61] *Cabrera Direct Appeal*, 840 A.2d at 1268.
[62] *Id.* at 1264.

23

testified. The record also reflects that Cabrera's trial counsel did try to corroborate Mathis' recantation statements.[63]

Finally, § 3507 did not offer a path to admit Mathis' out-of-court statements.[64] Under the language of the statute, Mathis was not "present and subject to cross-examination" such that her out-of-court statement could then be admitted. Further, her recantation was not a "prior statement" as required by the statute. She recanted her trial testimony *after* trial. Thus, the Superior Court correctly held that counsel was not constitutionally ineffective in addressing Mathis and her testimony.

E.

Cabrera next argues that his constitutional rights were violated because jurors who were otherwise qualified were excused based on their views of the death penalty. During jury selection, eight prospective jurors were excused because they voiced opposition to the death penalty. Cabrera emphasizes that despite their opposition, the potential jurors stated they would still have been able to follow the court's instructions and decide the case in accordance with the law.

Because Cabrera never challenged the exclusion of the jurors at trial or on direct appeal, we agree with the Superior Court that the claim is procedurally

---

[63] Trial Counsel Affidavit in Response to Motion for Postconviction Relief at ¶ 16.
[64] 11 *Del. C.* § 3507(a) ("In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.").

defaulted under Rule 61(i)(3). We also agree with the Superior Court that no miscarriage of justice occurred such that the claim should be heard under Rule 61(i)(5). A juror must be excused if that juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath."[65] When the death penalty statute was in effect in Delaware, the trial court was permitted to seek through direct questioning whether, after a guilty verdict, jurors would be able to impose the death penalty. Our Court had consistently upheld this so-called "death qualification process" in capital murder cases.[66] In *Gattis v. State*, we noted that "justice is not served by allowing persons to sit on a jury in a capital case who are unable to render an impartial verdict because of their opposition to the death penalty."[67] These principles, therefore, mandated that a juror who was opposed to the death penalty be excused from a trial in which the State sought the death penalty.

Here, the eight prospective jurors stated that, although they would be able to follow the trial court's instructions, they would be unable to recommend the death penalty.[68] Although Cabrera takes issue with the court's instruction describing the

---

[65] *Barrow v. State*, 749 A.2d 1230, 1237 (Del. 2000) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).
[66] *See id.*
[67] 697 A.2d 1174, 1181 (Del. 1997) (internal citations omitted).
[68] App. to Opening Br. at 48, 51, 57, 63, 67 (Trans. of Jury Selection, Jan. 9, 2001), 79, 82 (Trans. of Jury Selection, Jan. 16, 2001).

jury's role as one of *recommending* rather than *imposing* a death sentence, our Court addressed the same claim in Cabrera's direct appeal and found it without merit. Under the sentencing scheme of Delaware's death penalty statute, the jury was required to "deliberate and recommend to the Court" whether a statutory aggravating circumstance existed and whether the aggravating circumstance outweighed the mitigating circumstances.[69] The jury charge was consistent with Delaware law. Counsel could not be ineffective for failing to raise an unsuccessful argument.

F.

On February 10, 2001, at around 5:30 p.m., less than two days after jury deliberations began, the jury foreman notified the trial court that the jury was deadlocked. At 6:00 p.m., the court instructed the jury to stop deliberations for the day. Also at that time, the court gave the jury an *Allen* charge. An *Allen* charge is a request from the court to the jury to attempt to come to a decision without abandoning any firmly held beliefs.[70] Following the *Allen* charge, the jury left the court and resumed deliberations the next morning. On February 11, 2001, at 12:45 p.m., the jury reached its verdict. The jury convicted Cabrera of two counts of First Degree Murder, two counts of Conspiracy in the First Degree, and other offenses.

---

[69] 11 *Del. C.* § 4209(d) (1991). *See Barrow*, 749 A.2d at 1240 ("This Court has recognized that, under Delaware's current statutory scheme where the jury merely recommends a sentence . . . .").
[70] *Bradshaw v. State*, 806 A.2d 131, 134 (Del. 2002).

26

During the penalty phase, the jury recommended that Cabrera be sentenced to death, and the trial court followed its recommendation.

According to Cabrera, the trial court's *Allen* charge violated his constitutional rights in three ways. First, the *Allen* charge was unduly coercive. Second, the charge lacked transitional language which created an intolerable risk of an unwarranted conviction. And third, his trial counsel provided ineffective assistance by failing to have Cabrera present at the office conference concerning the *Allen* charge.

Cabrera did not challenge the *Allen* charge on coercion grounds during the trial or on direct appeal. The Superior Court correctly determined that the coercion claim is therefore barred by Rule 61(i)(3), and no miscarriage of justice occurred under Rule 61(i)(5) to overcome this procedural bar. The instruction was as follows:

> It is unnecessary to add that the Court does not wish any juror to surrender his or her conscientious convictions . . . . Each of you must decide the case for yourself . . . . Remember, at all times no juror is expected to yield . . . his or her conscientious conviction . . . . [I]t is your duty to agree on a verdict if you can do so without violating [jurors'] individual judgment and [conscience].[71]

The trial court's instruction avoided coercion by purposefully reminding jurors not to abandon their convictions. The *Allen* charge was properly given and thus could not have resulted in a miscarriage of justice sufficient to overcome the procedural bar of Rule 61(i)(3).

---

[71] App. to Opening Br. at 215-16 (Trial Trans., Feb. 10, 2001).

27

Cabrera previously asserted his second claim regarding the lack of transitional language during an office conference about the charge.[72] The trial court addressed the claim during the office conference and determined that additional transitional language was not needed.[73] He did not raise the issue on direct appeal. This claim is therefore barred under Rule 61(i)(4), and Cabrera has offered nothing new from the court's earlier disposition such that the interests of justice warrant reopening the issue.

The related claim of ineffective assistance of counsel is without merit because under Superior Court Criminal Rule 43(c)(3), a criminal defendant is not required to be present during "a conference or argument upon a question of law." Nonetheless, Cabrera's trial counsel did consult with him about "virtually everything"[74] and, unlike in *Bradshaw v. State*,[75] Cabrera was present when the trial court read the *Allen* charge to the jury. Cabrera thus has not demonstrated that his counsel was constitutionally ineffective under *Strickland*.

G.

Cabrera next argues that his constitutional rights were violated by three instances in which the State failed to disclose exculpatory or impeachment evidence.

---

[72] *Id.* at 212 (Trans. of Office Conference, Feb 10, 2001).
[73] *Id.* at 212-15 (discussing whether transitional language was needed).
[74] App. to Answering Br. at 71 (Trans. of Postconviction Evidentiary Hearing, Oct. 10, 2012).
[75] 806 A.2d 131 (Del. 2002).

Under *Brady v. Maryland*, the State is required to disclose material exculpatory or impeachment information to the defense prior to trial.[76] Cabrera alleges that the State violated *Brady* by failing to disclose exculpatory or impeachment evidence related to three individuals: Keith Powell, a witness favorable to Cabrera; Sparkle Harrigan, a witness in Reyes' Rockford Park murder trial; and Carlos Rodriguez, a police informant who provided information about another individual's alleged involvement in the murders.

At trial, Powell testified that he was with Saunders and Rowe on the night of the murders as late as 11:00 or 11:30 p.m. He also testified that they were with a woman named Kim, and that Rowe had not been beaten up. The State cross-examined Powell based on prior statements he made to the police that were inconsistent with his trial testimony. The State did not disclose Powell's prior statements to Cabrera's trial counsel.

The Superior Court properly held that we previously addressed this issue on Cabrera's direct appeal. We determined that the State's failure to disclose Powell's inconsistent statements only undermined Powell's credibility and that the statements were not favorable to Cabrera's defense. Thus, we ruled that the undisclosed statements were not *Brady* material.[77] Accordingly, this claim is procedurally barred

---

[76] 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . falls within the *Brady* rule.").
[77] *Cabrera Direct Appeal*, 840 A.2d at 1270.

29

under Rule 61(i)(4), and, with nothing new offered in postconviction proceedings, the interests of justice do not warrant reconsideration of an issue decided in the direct appeal.

Cabrera also asserts a related claim of ineffective assistance of counsel relating to Powell. Cabrera argues that his trial counsel failed to investigate Powell adequately and failed to interview him. Based on the record, the Superior Court found otherwise. We agree with the Superior Court that Cabrera's claim is disproved by the record. Cabrera's trial counsel did attempt to meet with Powell on several occasions.[78] They eventually met with Powell twice and determined that he provided consistent information.[79] And, at the 2012 postconviction evidentiary hearing, Cabrera's trial counsel testified that they thought "Powell would be a good witness."[80] Accordingly, Cabrera cannot demonstrate that his trial counsel fell below an objective standard of reasonableness when investigating Powell as a witness.

Sparkle Harrigan was Saunders' girlfriend at the time of the murder. She testified at co-defendant Reyes' separate Rockford Park murder trial. This testimony, according to Cabrera, was different than the State's timeline presented in

---

[78] Trial Counsel Affidavit in Response to Motion for Postconviction Relief at ¶ 9.
[79] *Id.*
[80] App. to Opening Br. at 263 (Trans. of Postconviction Evidentiary Hearing, Oct. 23, 2012).

Cabrera's trial. Cabrera argues that Harrigan's statements were exculpatory and thus the State was required to disclose those statements to Cabrera prior to his trial.

Cabrera did not assert this argument at trial or on direct appeal. The Superior Court correctly found the claim procedurally barred under Rule 61(i)(3), and the circumstances did not result in a miscarriage of justice under Rule 61(i)(5). Harrigan's timeline of events did not contradict the State's timeline and was not exculpatory.[81]

Carlos Rodriguez was arrested in 2001 for drug dealing. After his arrest, Rodriguez served as a police informant. Cabrera claims that in a 2001 interview with the Deputy Attorney General, Rodriguez stated that his cousin, Omar Colon, was responsible for the Rockford Park murders. Cabrera argues that the State never disclosed this exculpatory information.

The Superior Court did not abuse its discretion in concluding that the record was insufficient to support Cabrera's claim. At the postconviction hearing, the former prosecutor, with a faded memory, thought that Rodriguez might have linked Colon to the Rockford Park murders, and she told the other trial prosecutor.[82] A

---

[81] Harrigan testified that she arrived at Saunders' house on January 20, 1996 at approximately 9:00 p.m., and stayed for about two hours. During that time, she allegedly heard Rowe arrive and talk to Saunders. *See* App. to Opening Br. at 220 (Luis Reyes Murder Trial Trans., Oct. 11, 2001). According to the State's timeline, Saunders and Rowe were heard sometime that night after 8:00 p.m. and possibly into the early hours on January 21, 1996. App. to Opening Br. at 179 (Trial Trans., Feb. 2, 2001).

[82] *Id.* at 288-91 (Trans. of Postconviction Evidentiary Hearing, Apr. 1, 2013).

31

number of witnesses undercut this testimony. The other prosecutor had no memory of having a conversation about Colon and his participation in the Rockford Park murders.[83] The investigating officers who were present for Rodriguez's interview testified that they did not recall Rodriguez making the comment.[84] Postconviction counsel deposed Rodriguez, and at his deposition, Rodriguez stated that he did not remember making the statement.[85] Rodriguez further stated that even if he had made a statement regarding Colon's involvement in the Rockford Park murders it was a rumor or personal opinion.[86] Given the uncertainty surrounding the existence of the statement, the Superior Court correctly decided that the State did not violate its *Brady* obligations.

## H.

Cabrera next argues that his constitutional rights were violated because three jurors who supposedly were prejudiced and incompetent served on the jury. First, Cabrera argues that the trial court should have excused Juror No. 8, who, Cabrera claims, lied about hearing another juror say "I think [Cabrera's] guilty." Second, Cabrera argues that the trial court should have inquired further into whether Juror No. 9, who told the bailiff that Cabrera's wife "looked familiar," actually knew

---

[83] App. to Answering Br. at 123-24 (Trans. of Postconviction Evidentiary Hearing, Apr. 1, 2013).
[84] App. to Opening Br. at 283-84 (Trans. of Postconviction Evidentiary Hearing, Apr. 1, 2013); App. to Answering Br. at 122 (Trans. of Postconviction Evidentiary Hearing, Apr. 1, 2013).
[85] App. to Answering Br. at 114 (Carlos Rodriguez Dep.).
[86] *Id*. at 112-13.

Cabrera's wife. Third, Cabrera argues that the trial court should have excused Juror No. 5, who stated: "I would like to be excused from this jury. I fear my mental health is at stake."[87] Allowing these individuals to remain on the jury, Cabrera argues, violated his constitutional right to an impartial jury and prejudiced the fairness of the trial. Cabrera also argues that his trial counsel provided ineffective assistance by failing to move to strike these jurors.

Cabrera did not raise these claims at trial or on direct appeal. Thus, they are procedurally defaulted under Rule 61(i)(3) unless Cabrera can demonstrate a miscarriage of justice under Rule 61(i)(5). The Superior Court thoroughly addressed—and rejected—these arguments in 2008 after Cabrera requested to conduct *ex parte* interviews of the jurors.[88] For the reasons expressed in the Superior Court's 2008 decision, no miscarriage of justice has occurred because Cabrera would not have prevailed on these claims. Furthermore, Cabrera stated repeatedly that he did not want a mistrial declared.[89] Thus, Cabrera cannot demonstrate that his counsel was constitutionally ineffective under *Strickland* for following his wishes.

## I.

Cabrera next argues that the trial court's denial of his motion to interview jurors violated his constitutional rights. The trial court concluded that Cabrera

---

[87] App. to Opening Br. at 437 (Juror Note No. 2).
[88] *See State v. Cabrera*, 984 A.2d 149 (Del. Super. 2008).
[89] *Cabrera*, 984 A.2d at 153-56.

offered no new information other than what was before the court at the time of trial, and there was no need for Cabrera to contact the jurors. The court also addressed Cabrera's argument that Rule 3.5(c) of the Delaware Lawyers' Rules of Professional Conduct, which prohibits such contact with jurors unless "permitted by court rule," is unconstitutional.

We assume, without deciding the constitutional issue, that Cabrera had a right under certain circumstances to contact jurors, and affirm on the trial court's alternative ground that Cabrera failed to demonstrate good cause to explore possible extraneous influences on the jury. As the trial court held after thoroughly reviewing its interaction with the jurors, "without presenting anything new since the trial, the 2001 record does not support a basis for [further] examination of jurors, *ex parte* or otherwise."[90] Our independent review of the record supports the trial court's conclusion. Thus, we agree with its determination that Cabrera failed to demonstrate good cause to permit his counsel to contact the jurors in his 2001 trial.

J.

Finally, Cabrera challenges the Superior Court's denial of his motion in postconviction proceedings for additional discovery. Cabrera moved for extensive discovery relating to the seizure of the gun from his father's residence, the relationship between the investigating detective and Mathis, and the out-of-court

---

[90] *Id*. at 175.

34

statements of Harrigan and Powell. The Superior Court denied that request. Cabrera also renewed his motion, which the court also denied. On appeal, Cabrera reasserts his request for discovery relating to these issues. We review the Superior Court's denial of Cabrera's discovery motion for abuse of discretion.[91]

The Superior Court possesses "inherent authority under Rule 61 in the exercise of its discretion to grant particularized discovery for good cause shown."[92] But, part of the calculus must be the stage of the proceedings. Cabrera has had a trial and a direct appeal. In postconviction proceedings, "good cause" is a heavier burden than the showing needed for pretrial discovery.[93] Especially at the postconviction stage, "petitioners are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence."[94]

The Superior Court determined that (a) discovery relating to the seizure of the gun from Cabrera's father's house was unnecessary because "the circumstances surrounding the seizure of gun has been fully developed;" (b) the trial court and the Supreme Court already explored the circumstances concerning Mathis' testimony; and (c) further factual discovery relating to witnesses Harrigan and Powell would

---

[91] *Dawson v. State*, 673 A.2d 1186, 1197 (Del. 1996).
[92] *Id.*
[93] *Id.* at 1198.
[94] *State v. Jackson*, 2006 WL 1229684, at *2 (Del. Super. May 3, 2006) (quoting *Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d. Cir. 1994)).

not assist the defense in making postconviction relief claims.[95]  We find no abuse of discretion in the trial court's determinations.

## III.

Cabrera received a fair trial.  His counsel was not constitutionally ineffective. Thus, we affirm the judgment of the Superior Court.

---

[95] *State v. Cabrera*, No. 9904019326, at 1-2 (Del. Super. Oct. 4, 2012).