# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | I.D.: 1505012411 |
| v. | ) | |
| | ) | |
| DAMIAN THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |

**SUBMITTED: August 30, 2021**

**DECIDED: November 10, 2021**

## OPINION ON DEFENDANT'S AMENDED MOTION
## FOR POST CONVICTION RELIEF

*Sean P. Lugg, Deputy Attorney General*, Office of the Attorney General, Carvel State Office Building, 820 N. French Street, 7th floor, Wilmington, Delaware, *Attorney for the State of Delaware*.

*Christopher Koyste, Esquire*, 709 Brandywine Boulevard, Bellefonte, Delaware, 19809, *Attorney for Defendant Damian Thomas*.

**Jones, J.**

## INTRODUCTION

On April 18, 2019, Defendant Damian Thomas ("Thomas") filed a *pro se* Motion for Post-Conviction Relief, Appointment of Counsel, and an Evidentiary Hearing pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 Motion"). Counsel was appointed. On January 22, 2021, Mr. Thomas' appointed counsel filed an Amended Motion for Postconviction Relief. Briefing on these motions is complete and the case is ready for a decision. For the reasons stated below, Defendant's Motions are DENIED.

## BACKGROUND AND PROCEDURAL HISTORY

On July 18, 2016, a New Castle County grand jury charged Thomas with First Degree Murder, Possession of a Firearm During the Commission of a Felony ("PFDCF"), Possession of a Firearm by a Person Prohibited ("PFBPP") and Carrying a Concealed Deadly Weapon ("CCDW"). Thomas was arrested the same day.

On September 19, 2017, after a five-day trial, a Superior Court jury found Thomas guilty of First-Degree Murder, PFDCF, and CCDW. The parties agreed to sever the PFBPP charge and to waive a jury trial for the adjudication of that charge. A bench trial followed the return of the jury's trial verdict, and the trial judge found Thomas guilty of the PFBPP charge.

On November 2, 2017, the Superior Court sentenced Thomas to serve the remainder of his natural life in prison for his First-Degree Murder conviction and to 5 years incarceration followed by decreasing levels of probation for the remaining three charges. Thomas appealed his conviction to the Delaware Supreme Court. The Delaware Supreme Court affirmed the Superior Court on March 26, 2019.

In Thomas' direct appeal, the Delaware Supreme Court found the following:

> The evidence against Thomas was considerable and, even without Detective Curley's opinion testimony, more than sufficient to support Thomas's conviction. Two other eyewitnesses—Etta Reid and Leantaye Cassidy—testified that they saw Thomas shoot Deshannon Reid before he fled through the parking lot.[18] Moreover, Thomas's former cellmate, testified that Thomas told him that he retrieved a gun and shot Deshannon following a drug-related argument. Lastly, the jury had the ability to review on its own the content of the surveillance videos and determine whether it was Thomas on the tapes. This evidence—coupled with the facts that Thomas fled from Delaware and his girlfriend of seventeen years, remained at large for a year, and admitted that he was wanted for murder in Delaware when police apprehended him in New Jersey in 2016—is sufficient to sustain Thomas's conviction. Thus, even if the Superior Court erred in admitting the detective's opinion, such error was harmless and does not warrant reversal.[1]

A third eyewitness, Monique Pruden was called by the State. As to Ms. Pruden's testimony, the Supreme Court had this to say:

> A third purported eyewitness was apparently discredited when the defense introduced evidence that she was

---

[1] *Thomas v. State*, 2019 WL 1380051, at *4 (Del. 2019).

incarcerated on the night of the murder. The State countered that the evidence suggested that the witness could have been on work release at the relevant time, but the Superior Court, in the absence of evidence supporting this contention, precluded the State from arguing that point to the jury.[2]

It is the testimony of Ms. Pruden that forms the basis of Thomas' instant Rule 61 motion.

## GROUNDS FOR RELIEF

Thomas advances three arguments as to Pruden's testimony. Thomas alleges that (1) his conviction was tainted by the use of Pruden's perjured testimony; (2) the State committed prosecutorial misconduct by failing to correct Pruden's perjured testimony and by addressing this testimony in its closing and rebuttal arguments; and (3) the State committed a *Brady* violation by failing to search for, uncover, and disclose impeachment information pertaining to Pruden. In his fourth claim, Thomas asserts that an evidentiary hearing is needed to "determine whether the State suppressed material impeachment information in relation to Pruden's June 16, 2015 statement to Detective Curley."[3]

## FACTS

The first statement of Monique Pruden was given pretrial to Detective Curley on June 16, 2016. His summary of that interview indicates:

---

[2] *Id.* at n. 18.

[3] Amended Motion at 55, *State v. Thomas*, (No. 1505012411) (Del. Super. 2019). Hereinafter referenced as "Amend. Mot."

4

I conducted an interview with Pruden on 6/16/15 at the Wilmington police station. This interview was recorded. Pruden advised that she knows the victim, Shannon and "Mutt." She said Shannon was the weed man and "Mutt" would buy weed off of him. She has since heard "Mutt" owed Shannon money. She explained that she was near Pete's pizza when she heard the gunshots and then "Mutt" ran past her onto Market Street. She did not see a gun in his hand but stated he could have put it into his waistband by then. Pruden was shown a six person photo line-up, and she positively identified Damian Thomas as "Mutt." She arrived at the scene and there were people around the victim. She explained that everyone was saying it was "Mutt" who had just shot DeShannon.[4]

On September 15, 2017, the State sent an email to trial counsel in which it said:

… Today we interviewed Monique Pruden. She was previously interviewed by [sic] Detective Curley and her interview was provided to you. A transcript of her previous interview was also provided. When re-interviewing Ms. Pruden she indicated she saw the shooting and that "Mutt shot Shannon." This second interview was recorded and I received a copy of this interview this evening. Please let me know the best way to get a copy of this interview to you tomorrow. [5]

On September 18, 2017, the State called Pruden to testify during its case-in-chief.[6] In relevant part, Pruden testified on direct examination that she was "present on the block the night that Deshannon Reid was killed."[7] She admitted on direct examination that her 2015 statement to Detective Curley would be inconsistent with

---

[4] A50.

[5] A73. Hereinafter, all references to (A) are to the Appendix filed by Thomas in the instant motion.

[6] A166.

[7] A168.

5

her soon-to-be-given-in-court testimony, explaining as to the reasons for the inconsistencies that "at the time I was just afraid, and I didn't want anything to do with it."[8] In explaining what she allegedly saw, Pruden testified, "I was on 27th Street. I was standing there by the church, and I heard Shannon and Mutt. They were arguing. They were on the sidewalk in front of Shannon's house --."[9] Ms. Pruden thereafter identified Mr. Thomas as "Mutt" by pointing him out to the jury.[10] Pruden then continued with her testimony, and the following exchange with the DAG occurred:

A. They were arguing, and then they were arguing on the sidewalk.

Q. Where on the sidewalk?
A. Like, in front of Deshannon's house, and then Deshannon spit on Mutt. After that, they were - - he said, "Mother fucker, I'll be back.

Q. Who said that?
A. Mutt, and then, I would say five minutes went by. He came back. They were still arguing again.[11]

According to Pruden, "Mutt walked right by her in the direction of Market Street" and was gone for "about five minutes" before he returned.[12] Pruden further testified that Reid and Thomas resumed arguing, that Reid was "waving his hands

---

[8] A168-69.
[9] A169.
[10] *Id.*
[11] A170.
[12] A170-71.

6

around" and that Thomas had a gun and "[w]hen Deshannon turned around, he pulled it out and he started shooting."[13] She stated that she saw the gun come out, heard the shots, and saw Mutt's hand extended.[14] Pruden testified that "after he shot Deshannon Reid," Mutt "ran through Pete's parking lot."[15] She further averred that she was familiar with Mutt before all of this happened, and that she had no problem seeing any of the events that night and that she was testifying from what she saw that night.[16]

On cross-examination, trial counsel asked Pruden, "It is your testimony today that you saw everything?"[17] Pruden responded "Yes."[18] Trial counsel then inquired of Pruden, "It's your testimony today that you were on 27th & Market on October the - - on April the 14th, 2015, correct?"[19] Pruden responded "Yes."[20] She specified that she was standing on 27th Street by the church, not exactly in front of the church, but closer to Deshannon's home, on the same side that Deshannon lives on."[21] Ms. Pruden testified that she did not see Deshannon's mother, Ms. Reid, outside that

---

[13] A171.
[14] A172.
[15] *Id.*
[16] A173.
[17] A176.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

day.[22] Thereafter, the following exchange occurred between trial counsel and Pruden:

> Q. And you said earlier you told police you only heard the shooting, but this time you're saying that you saw the shooting, correct?
>
> A. I saw it the first time. I didn't want anything to do with it.
>
> Q. Okay, and the testimony that you're giving, you're giving this under oath, right?
>
> A. Yes.
>
> Q. And this is the hundred percent the truth, the whole truth and nothing but the truth?
>
> A. Yes.
>
> Q. And how sure are you of that?
>
> A. Cause I was there.
>
> Q. You were there. Is there anything that I could say to make you think that you weren't there?
>
> A. I guess you will; won't you?
>
> Q. No, I'm just asking you.
>
> A. No, you cannot.[23]

---

[22] A179, 182.
[23] A182-83.

Trial counsel then asked Pruden if she was in WCI on April 7, 2015, to which Pruden responded yes.[24] Trial counsel then requested a recess, at which point trial counsel stated:

> Your Honor, here's where we are in this matter. Miss Pruden has testified that she was present on April the 14th, 2015 at - - on Market Street and 27th. We have evidence to show that on April the 24th, 2015[25] she was sentenced by Judge Street to 3 months at Level V. Her release date would have, and it is, 4/27/15 - - 4/29/15, Your Honor.

> I've shown the State a copy of the inmate locator. There's an inmate locator that is sent that shows every person that is incarcerated on a certain day in the State of Delaware. I've pulled the date to show that on April the 13th, 2015, Ms. Pruden was in the custody of the Department of Correction in the Hazel Plant Correctional Center at WCI on Baylor on February 13, 2015.

> I pulled the date to show that Miss Pruden was also in custody at the Department of Correction on April 15, 2015. I show - - I also pulled the date that says that she was in custody on April the 29th, 2015, and I pulled the records to show that she was no longer in custody on May 1st 2015.

> I have the Sentencing Order, Your Honor. I have the Court's commitment paper, and I also have the violation report that was filed on 6/9/2015 that also says that she was released from custody on May 1st, 2015 and was violated for failure to report to Level III probation, that is currently pending, cause she was out on capias since that time.[26]

---

[24] A183.

[25] It appears that trial counsel mistakenly said "April" when he meant February. *See* A246.

[26] A185-86.

The DAG advised that they had never seen those records and needed time to review them.[27] The State also agreed to provide trial counsel with DELJIS records that would show Pruden's actual release date from custody.[28] Upon returning from recess, the DAG stated that "I believe everyone is on the same page now, that she was at Hazel D. Plant Center. Mr. Armstrong will cross-examine her about that facility and what inmates can or can't do, and the State will redirect."[29]

During trial counsel's resumed cross-examination of Pruden, she refused to acknowledge that she was in the custody of the Department of Correction ("DOC") on the day of the shooting. Instead, she insisted that she was working at Deal$ in April 2015 from 12:00 pm to 5:00 pm and was living at 303 West 29th Street.[30] Pruden further stated that she had been sentenced to probation, despite the sentence order showing that she received Level V time and that trial counsel was wrong in stating that she was released from custody on April 29, 2015.[31] When trial counsel asked Pruden whether, factoring in good time, she was released from custody on April 29, 2015, she insisted he was incorrect stating that "It wasn't April 29th. You're trying to say I was in jail when this went down, I was not."[32]

---

[27] A187.
[28] *Id.*
[29] *Id.*
[30] A189, 192, 195-202.
[31] A193-94, 196.
[32] A195-96.

10

Trial counsel questioned Pruden on her violation paperwork which stated she had been released from custody on May 1, 2015 and that she did not live at the address she had provided at trial, 303 West 29th Street.[33] When trial counsel specifically asked, "I want to know if you were incarcerated on April the 14th, 2015," Pruden responded, "No."[34] Trial counsel followed up this question by asking "Even though the documents say that you were?" to which Pruden responded "Yes."[35]

Regarding the rules of Hazel D. Plant pertaining to curfew and work release, the following exchange occurred between trial counsel and Pruden:

Q.   And you said you've been - - you've done Hazel Plant before?
A.   Yes, I have.

Q.   All right.  Part of the rules is that there's a curfew, right?
A.   Yes.

Q.   What time's the curfew?
A.   Well, 10:00.

Q.   10:00
A.   But I never - - I wasn't in at 10:00.

Q.   So, you weren't in there at 10:00?

---

[33] A200-01.
[34] A210-11.
[35] A211.

A.     No, I was not.

Q.     And they also have phases in order for you to get and go on work release, right?

A.     Yes.

Q.     All right, and when you were at Hazel Plant, did you ever make - - what phase did you make in those two months that you were there?

A.     It wasn't work - - I had got - - I went home, because I had maxed up. So, I didn't have to end up making any phases.

Q.     So, you never - - you went home after you maxed out on April 29th, 2015; isn't that correct?  That's when you maxed out, right?

A.     If you say so.

Q.     That's exactly when you maxed out; isn't it?

A.     No, it's not.[36]

On redirect examination, the DAG read a description of Hazel Plant which noted that the facility has "work release as a component."[37]

After the jury left for lunch recess, the State advised the Court that they were "going to be looking for some information from the records that we just got from Mr. Armstrong during break."[38] Subsequently, trial counsel advised the Court that

---

[36] A211-12.
[37] A214.
[38] A221.

12

he may call someone from the Department of Correction as a defense witness.[39] In response to the Court questioning whether it could potentially be worked out by stipulation between the parties, the State responded "hopefully," and that it was attempting to get in contact with someone at the facility but was not successful. This was also confirmed by trial counsel who was also unsuccessful in his efforts to reach someone at the facility.[40] During closing arguments, the State stated:

> Now, ladies and gentlemen, the State anticipates Mr. Armstrong is going to discuss the inconsistencies in Etta, Taye and Monique's statements, talk about the inconsistencies in the distance of how far they were and where exactly they were in the street.

> He's going to talk to you about Monique. Monique was emphatic that she was out there. You heard Mr. Armstrong question her about her time at Hazel D. Plant Center.

> You are going to be instructed that you will be the sole judges of credibility in this case….[41]

During closing arguments, trial counsel made the following comments regarding Pruden's testimony:

> Then you have Monique Pruden. In the State's opening, they truly glossed over Monique, and then told you, well, even if you don't believe Monique, you still got three other witnesses. Monique's testimony conflicts with her previous statements, and the worst part of the whole thing is she was in jail. She got up on that stand, told you what she said,

---

[39] A224.
[40] A225, 227.
[41] A235.

13

collaborated everything everyone else said, and she was in jail. Uncontrovertedly, she was in jail.

The question is: Is there a credibility question? Is there a credibility gap? Are we really dealing with fake news?

….

Maybe that's not enough reasonable doubt for you as well. Let's talk about Monique Pruden. That's the elephant in the room. That's the person that everybody wants to just push aside. Prove to you she's in jail on April 14, 2015. Prove to you she's in jail on April 14, 2015, and she saw everything. Prove to you that she's in jail on April 14, 2015. Released from jail on May 1, 2015. Prove to you that she was released from jail on May 1, 2015.

Court order sentenced her to three months in jail. What else do we have? When she's responding it was, it wasn't me. We've got institutional records showing that she was in jail from 2/7 to April 29, and yet what do we get? Once again, wasn't me. Institutional records showing she was in jail on April 14, April 15 and April 29. Again, wasn't me.

….

Monique Pruden, we can toss her out of there. We know where she was. We just don't know why she said what she said and got up on that stand and did what she did.[42]

Thereafter, during rebuttal argument, the DAG stated:

Mr. Armstrong says to you that it is without a doubt that Monique Pruden was in jail. I think he writes jail up there five or six times. She's emphatic. She sits up there. She's there. The State submits to you, the records say she's at Hazel D. Plant, not jail. Hazel D. Plant.[43]

---

[42] Transcript of Trial at 72-73, 81-82, 88, *State v. Thomas*, No. 1505012411 (Del. Super. 2019).
[43] A240.

14

Trial counsel immediately objected, arguing:

At this point, the State is trying to insinuate that Hazel D. Plant is not a jail. It is actually a jail housed at WCI. That is a total misrepresentation of the facts.[44]

Thereafter, the following exchange occurred.

THE COURT: Is the State suggesting, because it should know that she was out on work release or was at liberty or not in custodial section?

DAG: I think the answer is no one knows. I think we can argue they put into evidence that it's a work release facility.

THE COURT: I know defense put that into evidence, but does the State believe that she was at liberty in some fashion on April 14, 2015?

DAG: I do not know.

THE COURT: Well, I think it's the State's - - the State is in control of the Department of Correction. I don't think the State should be permitted to suggest, just because this document was put into evidence, it was partially a work release facility, which probably is - -

DAG: Your Honor, sorry to interrupt.

THE COURT: Go ahead.

---

[44] *Id.*

15

DAG: On cross-examination she said she has a job at Deals on Miller Road in April of 2015.

THE COURT: What has the State found out from the Department of Correction as to where she was on April 14.

DAG: I do not have an answer. All I know is that she was at Hazel D. Plant, and I don't have a definitive answer. That's what we were trying to get, and I can't get it.

MR. ARMSTRONG: That is a Level V facility, your Honor. The State is now saying that it's not. It's a prison.

THE COURT: I think just because that document was put into evidence and suggests that it can be a work release referral, it is incumbent on the State, maybe just because a personnel at the department of Correction weren't there in the last couple days, when this 24 hours almost when this came to light, I don't think the State should be able to suggest that she might have been able to leave without affirmative proof given the seriousness of this that the defendant – I think it stated another way, I think the State is bound by the weight of the facts developing this case, that she was in prison on April 14, and I'm just going to preclude the State from arguing to the contrary.

The State is the one on this important issue that should be able to tell the Court whether or not she was in prison. If you say you can't tell that one way or the other, I'm not going to allow an argument to the contrary.[45]

The DAG stated that the State disagreed but would move on.[46] However,

defense counsel requested that the record be corrected, noting "She has said that she

---

[45] A240-41.
[46] A241.

16

was not in jail; she was at Hazel D. Plant, which leads the jury to believe she is not in jail. That needs to be corrected, Your Honor.[47] The DAG disagreed.[48] However, the Court concluded a correction was warranted, noting:

> Well, then I think the State should have put on some evidence that she was in the work release program or had the ability to leave, other than this document. I have to find the question because the State never argued until right now in rebuttal, that there was theoretical opportunity of her to not have been at Hazel D. Plant.
>
> I'm going to instruct the jury that Hazel D. Plant is a secure facility because I think it was incumbent on the State, having called her as a witness, found out the fact it did, to have shown one way or the other that she was in the custodial situation at Hazel D. Plant or not.
>
> So I'm going to instruct the jury that for the background facts, Hazel D. Plant is a, in fact, a jail.[49]

Thereafter, the Court stated, "Members of the jury, I instruct you that Hazel D. Plant facility is a jail."[50]

## PROCEDURAL BARS UNDER RULE 61(i)

"Postconviction relief is a collateral remedy which provides an avenue for upsetting judgments that otherwise have become final. It is not designed as a substitute for a direct appeal."[51] Superior Court Criminal Rule 61 governs motions for postconviction relief, establishing the procedures by which a defendant may

---

[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *William Henry Flamer v. State of Delaware*, 585 A.2d 736, 745 (Del. 1990).

collaterally attack his conviction. The Court first must determine whether the claim is barred under Superior Court Criminal Rule 61(i). Rule 61 contains several procedural bars but only the "procedural default" bar is pertinent to this case.[52] Specifically, Rule 61 (i)(3) prohibits a defendant from raising "any ground for relief that was not asserted in the proceedings leading to the judgment of conviction… unless the movant shows (A) cause for relief from the procedural default *and* (B) prejudice from the violation of movant's rights."[53] In order to show "cause for relief from the procedural default," Defendant must show that "'some external impediment' prevented him from raising the claim."[54] To show "prejudice from violation of the movant's rights," Defendant must show that there is a "substantial likelihood" that if the issue had been raised on appeal, the outcome would have been different.[55]

Thomas raises three claims relating to the verdict rendered against him by a jury. In his first claim, Thomas argues that his "right to due process of law under the Fourteenth Amendment to the United States Constitution and Article I, § 7 of the Delaware Constitution was violated when his conviction was tainted by the use of perjured testimony."[56] In his second claim, Thomas argues that "the State committed

---

[52] The State concedes the other procedural bars in Rule 61 do not apply to the Thomas' claims in his amended motion.

[53] Del. Super. Ct. Crim. R. 61(i)(3).

[54] *Younger v. State*, 580 A.3d 552, 556 (Del. 1990) (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

[55] *Flamer v. State*, 585 A.2d at 748 (quoting *United States v. Freddy*, 456 U.S. 152, 172, 174 (1982)); *see also Perez*, ID No. 1807009079, at 6.

[56] Amend. Mot. at 21.

four key errors with respect to calling Monique Pruden as a witness in its case-in-chief that cumulatively amounted to prosecutorial misconduct."[57] Thomas argues the State failed to: (1) adequately review Pruden's criminal record prior to trial; (2) secure records or call witnesses after Thomas produced records indicating Pruden was incarcerated at the time of the murder; (3) correct Pruden's "nearly certain" false testimony at trial; and (4) arguing from Pruden's false testimony in closing and rebuttal arguments.[58] In his third claim, Thomas argues that "the State violated its obligations under *Brady v. Maryland* by failing to search for and disclose crucial impeachment information demonstrating the falsity of Ms. Pruden's testimony," which violates Mr. Thomas' right under the Fourteenth Amendment to the United Sates Constitution and Article 1, § 7 of the Delaware Constitution."[59]

The State asserts that Thomas' claims are procedurally barred. Specifically, Thomas failed to raise these claims "leading to the judgment of conviction."[60] To overcome this procedural bar Thomas must show "cause for relief from the procedural default and … prejudice from the violation of [his, as] the movant's rights.[61] According to the State, Thomas cannot make this showing.

### THOMAS FAILS TO SHOW "CAUSE" TO OVERCOME THE PROCEDURAL BAR OF RULE 61

---

[57] *Id.* at 38.
[58] *Id.*
[59] *Id.* at 47.
[60] Del. Super. Ct. R. 61(i)(3).
[61] *Id.*

Thomas argues that he has shown "cause" or "some external impediment" which prevented him from raising his first three claims on direct appeal relating to violation of his due process rights, the use of perjured testimony, and a *Brady* violation by the State. "'Cause' for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim."[62] Thomas argues that he could not have raised these claims on direct appeal because "trial counsel could not have obtained the documentation needed to conclusively show that Ms. Pruden was in custody at Hazel Plant on April 14, 2015 and did not have the ability to leave the facility on work release at that time."[63]

Thomas contends that he has established cause because the record is now more expansive then that on the direct appeal. He points to Pruden's recantation, the testimony establishing that Pruden was not working at Dollar Tree or Deal$ at the time of the murder, and the conclusive proof that Pruden did not have the ability to leave Hazel D. Plant on the day of the murder in support of this argument.

The record is clear that Thomas' counsel, before trial, had access to inmate locator sheets, Pruden's docket sheet, sentencing order, the Court's commitment paper, and violation report "all of which raised strong suspicion that Ms. Pruden was

---

[62] *Younger v. State*, 580 A.2d at 556 (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986)).
[63] Amend. Mot. at 23, 45-46, 53.

in custody at Hazel Plant on April 14, 2015."[64] However, Thomas advances that because the State continued to suggest to the jury, after trial counsel presented documentation evidencing that Pruden was incarcerated, that she was at some liberty to leave the facility, that trial counsel did not have documentation to "conclusively refute" that. Thus, Thomas could not have raised these claims on his direct appeal.

This Court is satisfied that based on the documentation that was available to trial counsel, and the use to which trial counsel put this material, that there was sufficient evidence available for these claims to be raised on direct appeal. By the time of the verdict, everyone was aware of the question of Pruden's whereabouts at the time of the murder and the arguments made by each side regarding Pruden. The trial court went so far as to give an instruction regarding Hazel D. Plant facility and prevented the State from arguing that Pruden was not incarcerated. On this record, there was nothing preventing Thomas from raising these issues in his direct appeal.[65]

## THOMAS FAILS TO SHOW THAT HE HAS SUFFERED PREJUDICE

Not only is cause lacking, but so is the conjunctive required showing of prejudice under Rule 61(i)(3).

### Claim I: Alleged Use of Perjured Testimony

In a Rule 61 motion, to show prejudice from violation of movant's rights, a defendant must show that there is a substantial likelihood that if the issue had been

---

[64] Amend Mot. at 33-34.
[65] The Dollar Tree records and the affidavit of Darren Carter is evidence that is merely cumulative to that presented at trial during the cross examination of Pruden.

raised on appeal, the outcome would have been different.[66] No such showing can be made in this case.

In the direct appeal in this case, the Delaware Supreme Court clearly noted:

> The evidence against Thomas was considerable and, even without Detective Curley's opinion testimony, more than sufficient to support Thomas's conviction. Two other eyewitnesses – Etta Reid and Leantaye Cassidy – testified that they saw Thomas shoot Deshannon Reid before he fled through the parking lot. Moreover, Thomas's former cellmate, testified that Thomas told him that he retrieved a gun and shot Deshannon following a drug-related argument. Lastly, the jury had the ability to review on its own the content of the surveillance videos and determine whether it was Thomas on the tapes. This evidence –coupled with the facts that Thomas fled from Delaware and his girlfriend of seventeen years, remained at large for a year, and admitted that he was wanted for murder in Delaware when police apprehended him in New Jersey in 2016 – is sufficient to sustain Thomas's conviction. Thus, even if the Superior Court erred in admitting the detective's opinion, such error was harmless and does not warrant reversal.[67]

This Court, joining in the Supreme Court's analysis of the facts here, concludes that, Thomas cannot overcome the hurdle of demonstrating that there is a substantial likelihood that if the issues had been raised on appeal, the outcome would have been different. In short, the issue of Pruden's whereabouts were before the jury and trial court, and the Delaware Supreme Court considered it as well. On this record, it cannot be said that there is a substantial likelihood that the outcome would

---

[66] *Flamer v. State*, 585 A.2d at 748 (quoting *Untied States v. Freddy*, 456 U.S. 152, 172, 174 (1982)); *see also Perez*, ID No. 1807009079, at 6.
[67] *Thomas v. State*, 2019 WL 1380051, at *4 (Del. 2019).

have been different when the issue was fully vetted and obvious at trial.[68] The evidence against Thomas was overwhelming. Moreover, the circumstances surrounding Pruden's whereabouts at the time of the murder was fully vetted at trial. The issues surrounding Pruden were obvious.

In an effort to get past this hurdle, Thomas argues that a different test should be employed by this Court in review of this matter. Citing to various United States Supreme Court decisions including, *Untied States v. Agurs*,[69] *Giglio v. United States*,[70] and *Napue v. People of Ill.*,[71] Thomas asserts that the proper standard for this Court to utilize to determine prejudice is whether "there is a reasonable likelihood that the perjured testimony of Pruden could have affected the judgment of the jury."[72]

Thomas' reliance on *Agurs* and *Giglio* is misplaced. In *Agurs*, the Court was asked to determine whether the defendant was deprived of a fair trial under *Brady* when the prosecutor failed to provide certain information to her about the victim that would have supported her self-defense claim.[73] The Court noted that *Brady* applied

---

[68] This Court does not agree with Thomas' argument that the record was incomplete on this issue. The record contained sufficient information for the Supreme Court to address any issue surrounding whether perjured testimony was offered in the trial court.

[69] 427 U.S. 97 (1976) (holding modified by *United States v. Bagley*, 472 U.S. 667 (1985)).

[70] 405 U.S. 150 (1972).

[71] 360 U.S. 264 (1959).

[72] Amend. Mot. at 21.

[73] *Agurs*, 427 U.S. at 98-99, 107.

in this situation where there was "discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense."[74]

Similarly, in *Giglio*, the issue before the Court was whether the petitioner was entitled to a new trial under *Napue* due process criteria.[75] The basis of the petitioner's motion was newly discovered evidence that the Government had failed to disclose – an alleged promise of leniency to a key witness in return for his testimony.[76] The witness in *Giglio* was an alleged co-conspirator of the petitioner and the *only* witness that linked him to the crime.[77]

In *Napue*, the issue before the Court was whether the petitioner was denied his due process rights when the prosecutor failed to correct testimony of a witness that he knew to be false.[78] The witness was the "principal witness," and his testimony "extremely important" because the circumstances made eyewitness identification "very difficult and uncertain," and other relevant witnesses were no longer in the state.[79] The witness testified that he had not been promised anything for his testimony against the petitioner. *After trial*, the Assistant State's Attorney filed a petition alleging that he had promised the witness that he would make a

---

[74] *Id.* at 103 (emphasis added).
[75] *Giglio*, 405 U.S. at 151.
[76] *Id.* at 150.
[77] *Id.* at 764.
[78] *Napue*, 360 U.S. at 265.
[79] *Id.* at 265-66.

recommendation and effectuate a reduction of his sentence for his testimony against the petitioner,[80] prompting the petitioner to then file a post-conviction petition.

In the cases cited by Thomas, the petitioners made allegations regarding newly discovered evidence *after* trial. At most, Thomas has alleged that trial counsel was unable to successfully obtain evidence to "conclusively refute" the State's suggestion that Pruden was at liberty to leave Hazel Plant at the time of the murder. All of the facts surrounding Pruden's custody status at the time of the murder were presented before the trial court. It is clear from the record that Pruden was in custody at Hazel D. Plant on April 14, 2015. The State was not able to obtain any evidence to support that Pruden was at liberty to leave the facility at the time of the murder. As such, the trial court prevented the State from arguing to the contrary. The trial judge further instructed the jury that Hazel Plant is a jail. Based on the evidence available at the time of trial, trial counsel was able to effectively cross-examine Pruden and discredit her testimony.[81] On this record, this Court does not find that Thomas suffered prejudice from the use of Pruden's testimony.

### Claim II: Alleged prosecutorial misconduct

---

[80] *Id.* at 266.

[81] Moreover, in *Giglio* and *Napue*, the witnesses who's testimony was at issue were described as "key," and "principal." In *Giglio*, the witness was the *only* witness linking the petitioner to the crime. The same is not true regarding Pruden in the instant case. There were two other eyewitnesses to the shooting, as well as Thomas' former cellmate who testified that Thomas told him he shot Deshannon Reid. There was also a video for the jury to consider. The Delaware Supreme Court also described the State's evidence against Thomas as "considerable," without giving any weight to Pruden's testimony.

Thomas argues that the prosecutors engaged in misconduct justifying relief under Rule 61. At the outset, this Court must determine whether any actions by the State constituted misconduct. Thomas first argues that the State's failure to adequately check Pruden's criminal records prior to trial was "grossly negligent."[82] Thomas additionally argues that even if the State did not have the responsibility to determine Pruden's custody status prior to trial, that the responsibility arose once Pruden's custody status was brought to the attention of the State.[83]

Thomas advances that the State knew about Pruden's conviction for Aggravated Menacing because the DAG actually questioned her about it on direct examination. Based on "the docket sheet alone for Ms. Pruden's Aggravated Menacing case leads one to believe that Ms. Pruden was in custody."[84] This Court is not persuaded that the State engaged in misconduct because it did not adequately review Pruden's criminal record prior to trial. There is simply no duty on the part of a prosecutor to review a witness's criminal history to determine custody status at the time of a specific event, absent some prior notice of the relevance of this issue. As this issue first appeared during Pruden's cross examination, there was no misconduct as to this issue.

---

[82] Amend. Mot. at 39.
[83] *Id.* at 40.
[84] *Id.* at 39, A246.

This Court further concludes that when the whereabouts of Pruden became an issue at trial, that the State did not engage in misconduct for failure to secure records or call witnesses. After trial counsel's cross examination of Pruden and the State's re-direct examination, the jury left for lunch recess.[85] The State advised the Court that they were "also going to be looking for some information from the records that we just got from Mr. Armstrong during break."[86] These records included the inmate locator sheet, sentencing order, the Court's commitment paper, and Pruden's violation report.[87] The Court questioned whether the issue could be worked out by stipulation between the parties, to which the State responded "hopefully." While the State did attempt to contact someone at the facility, it was unsuccessful in doing so. When the parties reconvened after the lunch recess, the State again explained that they were in unsuccessful, despite its efforts, in reaching anyone at the facility with the recess happening at lunch time. Trial counsel corroborated the State's failed attempts at reaching someone at the facility, noting he too was unsuccessful and was told that, "Apparently the Deputy Warden who is in charge is not in today, or we don't know if we can get it or whatever."[88]

Based on this record, it is clear that the State attempted to secure records when trial counsel raised the issue of Pruden's whereabouts at the time of the murder. The

---

[85] A221.
[86] *Id.*
[87] A185-86.
[88] A225, 227.

27

State, however, was unable to obtain those records which trial counsel did confirm the State attempted to do. Thus, there was no misconduct on the part of the State.

What is more troublesome to this Court is that once the issue arose regarding Pruden's custody status at the time of the murder, and after an apparent agreement had been reached as to how the issue would be handled, the State continued to suggest in closing and rebuttal argument that Pruden was not incarcerated at the time of the murder with no supporting evidence.

Specifically, the State during its closing said:

> Now, ladies and gentlemen, the State anticipates Mr. Armstrong is going to discuss the inconsistences in Etta, Taye and Monique's statements, talk about the inconsistencies in the distance of how far they were and where exactly they were in the street.

> He's going to talk to you about Monique. Monique was emphatic that she was out there. You heard Mr. Armstrong question her about her time at Hazel D. Plant center.

> You are going to be instructed that you will be the sole judges of credibility in this case....[89]

Further, during rebuttal, the State said:

> Mr. Armstrong says to you that it is without a doubt that Monique Pruden was in jail. I think he writes jail up there five or six times. She's emphatic. She sits up there. She's there. The State submits to you, the records say she's at Hazel D. Plant, not jail. Hazel D. Plant.[90]

---

[89] A235.
[90] A240.

28

It was then that trial counsel objected to this line of argument by the State and which the trial court agreed. Specifically, the trial court stated that it would not permit the State to argue the position that Pruden was at liberty to leave the facility at the time of the murder without evidence to support it. The trial court further provided an instruction to the jury that Hazel Plant is a jail. Based on the record, in this Court's view, the comments made by the State during closing and rebuttal could very well constitute misconduct. However, Thomas must still establish prejudice from the misconduct, which he cannot.[91]

Recently, in *Trala v. State*,[92] the Delaware Supreme Court had occasion to review and reaffirm the standards applicable in reviewing a prosecutorial misconduct claim.[93] In citing to its decision in *Saavedra v. State*,[94] the Delaware Supreme Court explained that where an objection is timely raised by defense counsel or the issue is addressed *sua sponte* by a trial judge, the reviewing court must examine alleged prosecutorial misconduct for harmless error.[95]

In the instant case, trial counsel immediately objected when the State continued to suggest to the jury that Pruden was at liberty to leave Hazel Plant with no evidence

---

[91] This Court has previously addressed why Thomas has failed to show cause to overcome the procedural bar. Because Thomas has failed to show cause, whether he makes a showing of prejudice or not will not relieve him of the procedural bar. However, this Court still determines that even if Thomas showed cause, he fails to show that he suffered prejudice from the misconduct.
[92] 244 A.3d 989 (Del. 2020).
[93] *Id.* at 998.
[94] 225 A.3d 364 (Del. 2020).
[95] *Trala*, 244 A.3d at 998 (citing *Saavedra*, 225 A.3d at 373).

to support this position. As an objection was made, the proper test is harmless error triggering the *Hughes* test.[96] The *Trala* Court, citing to *Baker v. State*, describes this analysis.

First, a court must determine whether misconduct occurred by reviewing the record *de novo*.[97] If no misconduct is found, then the analysis ends.[98] If misconduct is found, then a court must apply the three-factor *Hughes* test, since not all misconduct warrants reversal.[99] The *Hughes* factors are: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error."[100] These factors are not conjunctive and may impact cases differently.[101] The test is applied "in a contextual, case-by-case, and fact sensitive manner." [102]

---

[96] Thomas advances that this Court should engage in an analysis under *Hunter v. State* which is a misapprehension of the law. In doing a plain error analysis, where a court finds that reversal is not warranted, it will continue its analysis pursuant to *Hunter*.

> [U]nder *Hunter*, even where we are unable to conclude that the prosecutor's misconduct was so prejudicial as to compromise the fairness of the trial process, we may yet reverse where the misconduct is a part of a "persistent pattern of prosecutorial misconduct" *over different trials* such that a failure to reverse would compromise the integrity of the judicial process. *Trala v. State*, 244 A.3d 989, 998 (Del. 2020) (citing *Saavedra v. State*, 225 A.3d 364, 373 (Del. 2020)).

The Delaware Supreme Court has made clear that a *Hunter* analysis is applicable only in instances of misconduct that spread over a number of cases and not to multiple instances of misconduct in the same case as Thomas suggests. As such, a *Hunter* analysis is not applicable to this case.

[97] *Trala v. State*, 244 A.3d at 998.
[98] *Id.*
[99] *Id.* at 998-99.
[100] *Id.* at 999.
[101] *Id.*
[102] *Id.*

In applying the *Hughes* test to the facts of this case, the Court finds that there was no prejudice. As to the first factor, closeness of the case, it was not. Exclusive of Pruden's testimony, the Delaware Supreme Court described the State's evidence as "considerable."[103] The evidence included testimony of two eyewitnesses and Thomas' former cellmate. Additionally, the jury was able to review surveillance video. This evidence, along with Thomas fleeing from Delaware and his longtime girlfriend, admitting to being wanted for murder in Delaware when he was apprehended by police in New Jersey, was "sufficient to sustain Thomas's conviction," the Delaware Supreme Court concluded.[104]

Thus, this first factor weighs heavily in favor of the State.

The second factor, centrality of the issue, weighs in favor of Thomas. The evidence put on by the State has been discussed above. The State bore the burden at trial to prove each element of the offenses charged against Thomas beyond a reasonable doubt. This included identification of Thomas as the person who committed the offenses.[105] "[T]he test to establish identity is whether 'the [trier of fact] could rationally [find] sufficient evidence to conclude beyond a reasonable doubt' that the defendant committed the crime charged."[106] Thus,

---

[103] *Thomas v. State*, 2019 WL 1380051, at *4 (Del. 2019).
[104] *Id.*
[105] *See McDonald v. State*, 2016 WL 4699155, at *2 (Del. 2016).
[106] *Id.*

identification of Thomas as the person who shot and killed Deshannon was central to the State's case against him.

As to the third factor, steps taken to mitigate the effects of the error, it weighs in favor of the State. This Court has previously discussed the trial court's response to the State's continued insinuations that Pruden was at liberty to leave Hazel Plant at the time of the murder without evidence to support this position. When the State attempted to do such, the trial judge precluded it.[107] The trial judge then further instructed the jury that "Hazel D. Plant is a, in fact, a jail."[108] As such, this Court finds that the trial court's actions did mitigate the effects of the errors by the State.

Weighing the factors set forth in *Hughes*, this Court finds that there was insufficient prejudice to Thomas for him to overcome the Rule 61 procedural bar as to this claim. This case was simply not that close. There was "considerable" evidence to support Thomas' conviction absent Pruden's testimony. Lastly, the trial court played an active role in correcting the State's error by giving an instruction regarding the Hazel D. Plant facility.

### Claim III: Alleged *Brady* violation

According to Thomas, "the State violated its obligations under *Brady v. Maryland* by failing to search and disclose crucial impeachment information

---

[107] *Id.* at n. 18.
[108] A241.

demonstrating the falsity of Ms. Pruden's testimony."[109]   To establish a *Brady*

violation, a defendant must show (1) evidence exists that is favorable to the accused,

because it is either exculpatory or impeaching; (2) that evidence is suppressed by the

State; and (3) its suppression prejudices the defendant.[110]

The State provided Thomas with the substance of Pruden's 2015 conversation

with police investigators[111] and her 2017 pre-trial interview.[112]   Armed with this

information, Thomas investigated Pruden's whereabouts at the time of the homicide

and acquired documents showing her to be incarcerated at the time.  Trial counsel

effectively used this information to undermine Pruden's credibility, rendering her a

witness unworthy of credit.[113]  Where, as here, a defendant received and effectively

used impeachment material, there is no due process violation and *Brady* is not

contravened.[114]

Therefore, Thomas' alleged *Brady* violation claim is moot.

---

[109] Amend. Mot. at 47 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).
[110] *State v. Wright*, 67 A.3d 319, 324 (Del. 2013).
[111] Amend. Mot. at 7; A42, 50.
[112] Amend. Mot. at 8; A73.
[113] *Thomas*, 2019 WL 1380051, at *4.
[114] *See White v. State*, 816 A.2d 776, 778 (Del. 2003). Having concluded that there is no *Brady* violation, because the defense received and used the impeachment material effectively, there is no need for this Court to address the question of whether the Department of Corrections is part of the prosecution's team for purposes of a *Brady* analysis.

## THOMAS FAILS TO SHOW GOOD CAUSE FOR AN EVIDENTIARY HEARING

Thomas' final claim is a request for an evidentiary hearing. Thomas submits "[a]n evidentiary hearing is needed… to determine whether the State suppressed material impeachment evidence in relation to Ms. Pruden's June 16, 2015 statement to Detective Curley."[115] Thomas also maintains that a hearing is necessary to determine whether Pruden struck a deal with the State to give favorable testimony in exchange for a lighter sentence in a violation of probation against Pruden. "Under Rule 61, the Superior Court has broad discretion when determining whether an evidentiary hearing is necessary."[116] In determining whether an evidentiary hearing is warranted, the stage of the proceedings should be considered by the Superior Court.[117] "'[G]ood cause' is a heavier burden than the showing needed for pretrial discovery."[118] "Especially at the postconviction stage, 'petitioners are not entitled to go on a fishing expedition though the government's files in hopes of finding some damaging evidence.'"[119]

The record reveals that upon Thomas' request, the State "provided [postconviction counsel] with both the recording and transcript" of Pruden's June 16, 2015 statement.[120] And, in response to postconviction counsel's question

---

[115] Amend. Mot. at 55.
[116] *Winn v. State*, 2015 WL 1469116, at *2 (Del. Mar. 30, 2015) (citing Del. Super. Ct. Crim.R. 61(h)).
[117] *Cabrera v. State*, 173 A.3d 1012, 1033 (Del. 2017) (citing *Dawson v. State*, 673 A.2d 1186, 1198 (Del. 1996)).
[118] *Cabrera*, 173 A.3d at 1033.
[119] *Id.*
[120] Amend. Mot. at 55.

concerning the completeness of the information provided, Detective Curley confirmed with the State that there was no additional footage regarding Pruden's statement. On this record and in light of the Court's findings in this decision, it views the request for an evidentiary hearing as a "fishing expedition" which is contrary to well settled Delaware law.

As for the allegations that there was a deal between Pruden and the State, there is simply no evidence that has been produced to support such a charge other than mere speculation on the part of the defense. Like the issue with Detective Curley, this request appears to the Court to be another request to go on a fishing expedition. The Court sees no reason for an evidentiary hearing, and therefore DENIES Thomas' requests.

**IT IS SO ORDERED.**

/S/ *Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

*Original to the Prothonotary*

35